The question presented by these appeals is whether a private hospital can be liable for injuries caused by an unprovoked attack by a mental patient, who had been released from the hospital within 24 hours before the attack, on the ground that the hospital had assumed responsibility for the care, treatment, and control of the mental patient.
The plaintiff, Allen F. Morton, brought suit against Jackson Hospital and Clinic and Pendarvis Hunter, a mental patient released from the hospital, based upon an apparently unprovoked attack by Hunter upon him. Morton charged that the hospital was negligent in releasing Hunter. The trial court, finding no duty on the part of the hospital, granted the hospital's motion for summary judgment, and these appeals ensued.
Pendarvis Hunter was released from Jackson Hospital's mental wing on November 5, 1986. On November 6, 1986, in an apparently unprovoked attack, Hunter cut the throat of plaintiff Allen Morton on the sidewalk along South Court Street in Montgomery.[1]
Hunter has a history of mental illness beginning with his stint in the army. He was hospitalized while in the army and subsequent to his discharge moved to Montgomery and enrolled in the day treatment program of the Montgomery Area Mental Health Association. While at his local mental health center, Hunter engaged in a shoving match with another patient; he was then transferred to Jackson Hospital's mental wing. He was voluntarily admitted by Dr. Cecil Prescott,[2] a psychiatrist on the staff at Jackson Hospital. Dr. Prescott diagnosed Hunter as a schizophrenic paranoid type and after a four-day stay recommended that he be transferred to a long-term care facility.
The Veterans' Administration hospital in Tuskegee provisionally accepted Hunter, and he was discharged from Jackson Hospital. However, upon his arrival in Tuskegee, Hunter's records were checked, and he was determined to be ineligible for VA hospitalization. He was readmitted to Jackson and stayed there from October 31, 1986, until his release on November 5, 1986.
Jackson Hospital's mental facility is designed for short-term care only. Ordinarily, patients with serious mental problems are transferred after a few days to long-term care facilities. Dr. Prescott recommended to Hunter's family that they begin involuntary commitment proceedings. Hunter's family, however, decided against involuntary commitment and agreed to keep looking for other facilities. Dr. Prescott *Page 1017 
is the only psychiatrist on the staff of Jackson Hospital, and he testified that he was in complete control of the admission and discharge of mental patients. While at Jackson, Hunter was confined to a secluded area intermittently throughout his stay, in an effort to control his inappropriate behavior. He was placed in seclusion from 2:30 p.m. on November 4 until 1:00 p.m. on November 5. He was released later that day.
While at Jackson, Hunter was placed on various drug regimens, although Dr. Prescott testified that he had not been on any one drug long enough to effectuate control of his condition. Hunter was released with several prescriptions and an open letter describing his condition to other possible health care providers. Dr. Prescott testified that he believed the local mental health officials would do follow-up work. The attack occurred the following day.
The first issue presented concerns the relationship between Dr. Prescott and Jackson Hospital. Morton argues that Dr. Prescott was acting as an agent for the hospital during Hunter's treatment and at his discharge, that the hospital cloaked Dr. Prescott with apparent and implied authority to act for the hospital, and that the duty to control Hunter was similar to the duty of one who engages in an inherently dangerous activity, and therefore, that that duty was nondelegable. We need not reach these arguments, due to the insufficiency of the pleadings on the issue of agency.
 "[T]he pleader must, in pleading agency, allege some facts that show an agency relationship; that the agent was acting within the line and scope of his authority; and that the injury complained of was the proximate result of the agent's negligence or wantonness."
Robinson v. Allstate Ins. Co., 399 So.2d 288 (Ala. 1981). Morton argues that the complaint, when considered as a whole, adequately raises the issue of agency by including various fictitiously named parties. Specifically, he asks us to look at paragraphs 4 through 8 of the complaint. Paragraphs 4 through 8 read:
 "4. John Doe, Richard Roe, Mary Doe and Jane Doe, as well as other fictitious parties named herein, including ABCDEFG Corporations XYZ Partnership, those individuals, associations, partnerships or corporations which wilfully or wantonly or otherwise negligently participated in the injuries suffered by the Plaintiff described hereinbelow. These un-named fictitious parties will be added by way of amendment when ascertained but participated directly or indirectly in the wilful or wanton conduct causing the release of the patient at its hospital named Pendarvis Hunter (Defendant herein) and or negligently caused his release thereby.
 "5. That prior to November 6, 1986, the said Pendarvis Hunter was a resident patient in the Defendant hospital operated by Jackson Hospital 
Clinic, Inc., a corporation; that he was treated in said hospital for a severe mental illness in the nature of paranoia schizophrenia.
 "6. That the unknown parties Defendant and fictitious parties described hereinabove were then and there engaged for the purpose of treating the said Defendant Pendarvis Hunter for his severe mental illness; that the said Defendant Hunter had previously a lengthy history of said mental illness, frequent and numerous episodes of violent conduct and behavior; was clearly unable to reside with his known family and relatives due to the mental illness suffered by him and he was known beyond peradventure that to said unknown and un-named fictitious parties and Defendant Jackson Hospital Clinic, Inc., a corporation, to be a person of violent propensities, subject to insane delusions, murderous moods and conduct, which could result in death or disability to the Plaintiff and other citizens similarly situated.
 "7. For that the Defendant Jackson Hospital and Clinic, Inc., a corporation, and the fictitious parties named herein did wilfully or wantonly or in the alternative negligently cause, allow or direct the release of the Defendant Pendarvis *Page 1018 
Hunter to the community of Montgomery, Alabama.
 "8. As a proximate consequence of the stated wilful or wanton conduct or in the alternative negligent conduct of the Defendants named herein, the Plaintiff Allen F. Morton suffered the following injuries and damages:
 "His throat was violently cut, he was caused to be hospitalized for a protracted period of time, he was caused to incur substantial expenses for medicals [sic], doctors, nurses, therapist [sic] and for medicines and drugs in and about treating said injuries; he will continue to have said expenses in the future; he was caused to suffer great and enormous pain and anguish; he continues to suffer said grievous mental pain and anguish and will do so in the future; he was rendered permanently and totally disabled thereby; all to his damages as aforesaid."
These allegations in the complaint do not give Jackson Hospital adequate notice of the agency claim. Clearly, that is the case, because it is quite apparent that the plaintiff knew of Dr. Prescott's role at the time summary judgment was entered. Therefore, we must determine whether there was presented a scintilla of evidence of Jackson Hospital's independent negligence without consideration of whether the acts of Dr. Prescott could be imputed to the hospital.[3]
The elements of negligence are well settled in Alabama. These elements are: (1) the existence of a duty on the part of a defendant; (2) a breach of that duty; (3) an injury to the plaintiff; and (4) the existence of a causal relationship between the defendant's conduct and the plaintiff's injury.Chatman v. City of Prichard, 431 So.2d 532 (Ala. 1983); AlabamaPower Co. v. Smith, 409 So.2d 760 (Ala. 1981).
The plaintiff contends that although Hunter was voluntarily admitted to Jackson, the hospital had the duty to bring involuntary commitment proceedings against Hunter. Section22-52-1(a), Ala. Code 1975, states:
 "(a) When any person desires to have any other person committed to the custody of the Alabama state department of mental heath or such other public facility as the court may order on the ground that such other person is mentally ill and as a consequence of such mental illness poses a real and present threat of substantial harm to himself or to others, the person so desiring shall file a petition, executed under oath, with the probate judge of the county in which such person is located, petitioning the probate court to commit such person to the custody of the Alabama state department of mental health or such other public facility as the court may order."
Under the facts of this case, we do not find that Jackson Hospital, a private mental hospital, undertook, or that the law imposed on it, the duty to seek involuntary commitment of its patients needing mental treatment. The evidence is undisputed that the decision to release Hunter was made by Dr. Prescott, and Morton has not presented any evidence linking hospital employees with the decision to discharge.
Morton contends that the duty to file commitment proceedings against Hunter was created by statements contained in an internal policy manual of the hospital. They point us to the section labeled "patient rights." That section provides in part:
 "As appropriate, the patient, patient's family or patient's legal guardian shall be fully informed about the following:
"* * * * *Page 1019 
 "g. the responsibility of the facility, when the patient refuses treatment, to seek appropriate legal alternatives or orders of involuntary treatment, or, in accordance with professional standards, to terminate the relationship with the patient upon reasonable notice;"
This section, even if read liberally, requires only that notice be given to "the patient, patient's family or patient's legal guardian" if a patient refuses treatment. This section does not create an affirmative duty on the part of the hospital to file commitment proceedings.
Morton also argues that a contract executed by Jackson Hospital and the Montgomery Area Mental Health Authority created a duty on the hospital to detain Hunter and seek his commitment. However, a careful reading of that contract shows that the only provision concerning involuntary commitment provides that the Mental Health Authority bears the responsibility for making the arrangements. There has also been no showing that Hunter was admitted to the hospital pursuant to that contract other than a showing of his referral from the Authority and his Medicaid status. Dr. Prescott and the hospital dealt with Hunter's family, not with the Authority, in formulating his treatment.
Morton's argument that the filing of the petition for commitment would have effectively detained Hunter is also erroneous. Section 22-52-7, Code of Alabama 1975, which provides for the treatment of those who await hearings on commitment, states:
 "(a) When a petition has been filed seeking to have limitations placed upon the liberty of a person pending the outcome of a final hearing on the merits, the probate judge shall order the sheriff of the county in which such person is located to serve a copy of the petition upon such person and to bring such person before the probate judge instanter. When any such person against whom a petition has been filed seeking to have limitations placed upon such person's liberty pending the outcome of a full and final hearing on the merits is initially brought before the probate judge, the probate judge shall determine from an interview with the person sought to be committed and with other available persons what limitations, if any, shall be imposed upon such person's liberty and what temporary treatment, if any, shall be imposed upon such person pending further hearings.
 "(b) No limitations shall be placed upon such person's liberty nor treatment imposed upon such person unless such limitations are necessary to prevent such person from doing substantial and immediate harm to himself or to others or to prevent such person from leaving the jurisdiction of the court. No such person shall be placed in a jail or other facility for persons accused of or convicted of committing crimes unless such person poses an immediate, real and present threat of substantial harm to himself or to others and no other public facility is available to safely detain such person.
 "(c) The probate judge shall order such person to appear at the times and places set for hearing the petition and may order such person to appear at designated times and places to be examined by licensed medical doctors and licensed mental health professionals. If such person does not appear as ordered by the probate judge, the probate judge may order the sheriff of the county in which such person is located to take such person into custody and compel such person's attendance as ordered by the probate judge. If temporary treatment or admittance to a hospital is ordered for any person, such treatment shall be supervised by a licensed medical doctor who has willingly consented to treat such person, and admission to a hospital shall be ordered by a licensed medical doctor who has willingly consented to admit and treat such person. (Acts 1975, No. 1226, p. 2562, § 5; Acts 1977, No. 670, p. 1143.)" (Emphasis added.)
Once again, it is important to note that Dr. Prescott was the only psychiatrist on the staff at Jackson Hospital and that *Page 1020 
he determined that Hunter was not dangerous. The statute calls for the "willing consent" of a licensed medical doctor to admit a patient for temporary treatment. That was clearly absent in this case. Although it is possible that Hunter might have been placed in the jail or in another hospital, Dr. Prescott, his treating psychiatrist, was in the best position to evaluate his condition. There must be probable cause to believe that confinement is necessary in order to hold a patient in emergency detention. Lynch v. Baxley, 386 F. Supp. 378 (M.D. Ala. 1974). In light of Dr. Prescott's opinion, there was no probable cause to detain Hunter in this case.
Under the facts of this case, Jackson Hospital had no duty to seek commitment, and, even assuming there was a duty, there was no evidence presented to indicate that the breach of that duty proximately caused the injuries to Morton.
The judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
HOUSTON, J., concurs.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, STEAGALL and KENNEDY, JJ., concur in the result.
[1] Hunter was found not guilty by reason of insanity at his criminal trial for first degree assault, and he was incarcerated in the Taylor Hardin Secure Medical Facility.
[2] Dr. Prescott is not a party to this lawsuit. The plaintiff has sued only the hospital and Hunter. We should not be understood as expressing any opinion as to the liability of Dr. Prescott, if any, should he be sued.
[3] Suit was filed on April 24, 1987, and the "scintilla rule" applies. See § 12-21-12, Code 1975. Under that rule, if a scintilla of evidence exists to support the position of the party against whom a motion for summary judgment is made, summary judgment must be denied. Harold Brown Builders, Inc. v.Jordan Co., 401 So.2d 36 (Ala. 1981). Summary judgment is proper only when the pleadings and affidavits submitted by the movant show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56(c), Ala.R.Civ.P.; Bon Secour Fisheries, Inc. v.Barrentine, 408 So.2d 490 (Ala. 1981). *Page 1021 *Page 1022