On December 18, 1987, Pauletta Parrish sued Dr. Bob Russell for injuries she sustained as a result of his alleged medical negligence. The trial court granted Dr. Russell's motion for summary judgment and entered a final judgment for Dr. Russell. Parrish appeals.
On December 19, 1985, Pauletta Parrish slipped and fell down some stairs at her daughter's mobile home and landed on her outstretched left arm. She was taken to Dr. Bob Russell, in Foley, Alabama, who determined that she had fractured the distal radius and ulna styloid bones in her left wrist, and, as a result of the fracture, had suffered some deformity in the wrist. X-rays were made of the fracture and Dr. Russell placed Parrish's arm in a cast. Whether Russell made a post-reduction X-ray after he put Parrish's arm in the cast is unknown. Dr. Russell told Parrish to return to his office in six weeks to have the cast removed, but that if she experienced pain or swelling she should return sooner.
On December 31, 1985, Parrish returned to Dr. Russell's office, complaining of pain. An X-ray taken during that visit revealed the problem to be a malunion of the fractured bones. On January 30, 1986, Dr. Russell removed the cast from Parrish's arm. On February 3, 1986, Parrish went to Dr. Robert Eubanks, who, noting a deformity of Parrish's left wrist, put Parrish in a physical therapy program to strengthen her hand and wrist and to increase the wrist's range of motion. On February 19, 1986, Parrish returned to Dr. Eubanks, complaining of discomfort in, and the prominence of, her wrist. During this visit, a shortening of the angulation was noted. *Page 330 
On March 31, 1986, Parrish saw Dr. Leo Flynn, who noted swelling and loss of motion and loss of strength in Parrish's left wrist as a result of the malunion. Dr. Flynn referred Parrish to a Dr. Whipple in Richmond, Virginia, who performed an osteotomy on the bones that had been fractured.
In her complaint, Parrish alleged that Dr. Russell negligently failed to-perform a post-reduction X-ray to determine whether her wrist was properly aligned in the cast. Further, says Parrish, because of this failure to X-ray, a malunion formed that resulted in reflex sympathetic dystrophy of her wrist, permanent deformity of her wrist, and continuous discomfort. Dr. Russell stated, in deposition, that Parrish picked up her X-rays from his office in March 1986; however, when asked about this during her deposition, Parrish replied, "No, sir." Parrish also alleged that the osteotomy performed by Dr. Whipple was necessary to correct the deformity to her wrist that occurred as a result of the alleged negligence of Dr. Russell.
The original complaint was filed on December 18, 1987, after the effective date of Ala. Code 1975, § 12-21-12 (abolishing the "scintilla rule" and replacing it with the "substantial evidence rule" in "all civil actions") and § 6-5-549
(abolishing the "scintilla rule" and replacing it with the "substantial evidence rule" in "any action . . . against a health care provider based on a breach of the standard of care"). Section 12-21-12 abolished the scintilla rule for all cases pending on June 11, 1987; Sections 6-5-549 and -552 abolished that standard for "all actions . . . based on acts oromissions accruing [occurring?] after June 11, 1987." It is not necessary for us to decide, however, whether this case is governed by the general provision (§ 12-21-12) or by the more specific provision (§ 6-5-549), because we find that the plaintiff met the higher requirement of offering "substantial evidence."
The physician's standard of care owed to the plaintiff-patient in this care is that set out at § 6-5-484(a): "[A] physician's . . . duty to the patient shall be to exercise such reasonable care, diligence, and skill as physicians . . . in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case." We note that the Legislature has modified this standard (see §6-5-548), but we note, further, that that modification does not apply in this case (see § 6-5-552).
Ordinarily, a plaintiff must prove a physician's medical negligence through the use of expert medical testimony.Bell v. Hart, 516 So.2d 562 (Ala. 1987); Lightsey v. BessemerClinic, 495 So.2d 35 (Ala. 1986); and Holt v. Godsil,447 So.2d 191 (Ala. 1984). Both Russell and Parrish, in their motions for summary judgment, and in the materials filed in opposition to summary judgment, relied upon testimony by medical experts. The issue presented, then, is whether the trial court, in light of the testimony of the parties and the testimony of each side's medical experts, erred in granting the defendant's motion for summary judgment.
Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Rule 56(e), A.R.Civ.P. Once the movant has made a prima facie showing of the absence of an issue of material fact, the burden is upon the nonmovant to rebut that prima facie showing. Berner v. Caldwell, 543 So.2d 686 (Ala. 1989). Here, the test is whether there was evidence that, when reviewed most strongly in favor of the non-movant (Parrish), is sufficient to establish that Dr. Russell was negligent and that his negligence was the probable cause of the injuries sustained by Parrish. If there was, then summary judgment was improper. Further, in a medical malpractice case, "there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury; there must be evidence that the negligence probably caused the injury."Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala. 1985) (emphasis added).
Parrish first argues that Dr. Russell was negligent in failing to make a post-reduction X-ray to assure proper alignment *Page 331 
of the fractured bones. Dr. Russell testified in deposition that, although he usually does a post-reduction X-ray after setting a fracture, he can not remember whether he did so after setting Parrish's wrist. Further, Russell testified that Parrish picked up all of her X-rays from his office in March 1986 and, therefore, that he does not have them for reference. Dr. Russell also stated that a failure to make a post-reduction X-ray, under the circumstances of this case, would be a breach of the minimum standard of care required of a physician.
Dr. Lloyd Russell, Dr. Eubanks, and Dr. Flynn each testified that a physician should take a post-reduction X-ray to be certain of proper alignment of the fractured bones. Dr. Eubanks testified that if there is a deformity as a result of the fracture, as there was in the instant case, a physician would want to X-ray to check position and alignment of the fractured bones and to know what type of reduction had been achieved. Dr. Eubanks further testified that there is a direct correlation between inadequate reduction of a deformed fracture and a malunion.
Dr. Lloyd Russell testified that a physician needs to make a post-reduction X-ray within a week to 10 days, if not immediately, after setting a fracture. He stated that during that first week to 10 days a physician can realign, if necessary, to prevent a malunion. Dr. Flynn testified that the malunion here could have been corrected if the misalignment had been noted within the first 24 hours after the reduction.
Parrish also alleges that Dr. Russell was negligent in not telling her to return sooner than six weeks after setting her wrist. Dr. Lloyd Russell testified that the minimum standard of care would probably require a physician to have the patient return in one or two weeks after the initial visit. Dr. Flynn testified that he would either put the patient in a hospital for continuous observation or would have her return the next day. Dr. Flynn further testified that had Parrish been re-examined and treated within 24 to 48 hours after her initial visit to Dr. Russell, the reflex sympathetic dystrophy probably would not have been as severe.
Parrish's left hand had had a previous injury that required skin grafts and the amputation of three fingertips. Parrish alleges that this condition of her hand put her at a higher risk for reflex sympathetic dystrophy and, therefore, that Dr. Russell should have taken greater precautions to prevent this result. Dr. Flynn testified that Parrish's prior problems with her left hand did put her at a higher risk for reflex sympathetic dystrophy. Therefore, according to Parrish, Dr. Russell was also negligent in failing to take greater precautions against this risk.
Parrish further alleged that Dr. Russell breached his duty of care in failing to refer her to an orthopedic surgeon upon his initial examination of her wrist. Dr. Russell did not, during the December 19, 1985, visit, refer Parrish to an orthopedic surgeon; however, on December 31, 1985, he did recommend that she see Dr. Lloyd Russell, an orthopedic surgeon in Fairhope, Alabama. Parrish did not see Dr. Lloyd Russell, but saw Dr. Eubanks instead. Dr. Flynn testified that in Pensacola, Florida, the standard of care would have required the physician to refer the patient to an orthopedic surgeon upon the initial visit. The standard of care in Pensacola would not be different from the standard of care in Foley, Alabama. This Court has recognized that
 "[d]istinctions in the degree of care and skill to be exercised by physicians in the treatment of patients based upon geography can no longer be justified in light of the presently existing state of transportation, communications, and medical education and training which results in a standardization of care within the medical profession."
Zills v. Brown, 382 So.2d 528, 532 (Ala. 1980). Accordingly, Russell's argument that Parrish's experts were not aware of the medical standard of care in Foley, Alabama, is without merit.
There was expert testimony that a possible cause of the malunion could have been Parrish's activities after the cast had been *Page 332 
set. Parrish owned and operated a service company that cleaned condominiums, and her duties involved general housework. Parrish testified that she had a staff who worked for her, that she did not do any "hard work," and that she used only her right hand. Dr. Lloyd Russell testified that the minimum standard of care required a physician to instruct a patient as to what activities the patient should or should not engage in. The parties disagree as to whether Dr. Russell instructed Parrish not to work.
Relying upon affidavits and depositions, Dr. Russell met his burden of establishing a prima facie case — i.e., presenting factual evidence that, if uncontested, would entitle him to a judgment as a matter of law. Clearly, however, Parrish met her burden of rebutting that prima facie showing by presenting evidence of specific facts that created a genuine issue of material fact for consideration by a jury. Therefore, because there was evidence from which the factfinder could infer that Dr. Russell's treatment probably caused Parrish's injuries, summary judgment was improper.
For the reasons stated above, the judgment is reversed and the cause is remanded for trial.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, HOUSTON and KENNEDY, JJ., concur.