601 So.2d 435 (1992)
Kristina Ann FOSTER, as Administratrix of the Estate of James Bryon Foster, Deceased
v.
CHARTER MEDICAL CORPORATION, d/b/a Charter Hospital of Mobile; and Dr. Emanuel G. Defraites, Jr.
1901510.
Supreme Court of Alabama.
May 1, 1992.
Rehearing Denied July 10, 1992.
Patrick M. Sigler and Stephen C. Moore, Mobile, for appellant.
Davis Carr, Forrest S. Latta and James W. Lampkin II of Pierce, Carr & Alford, Mobile, for appellee Charter Hosp.
Reggie Copeland, Jr. and Robert S. McAnnally of Lyons, Pipes & Cook, P.C., Mobile, for appellee Emanuel G. Defraites, Jr., M.D.
PER CURIAM.
The plaintiff, Kristina Ann Foster, as administratrix of the estate of James Bryon Foster, appeals from summary judgments in favor of the defendants, Dr. Emanuel G. Defraites, Jr., M.D., and Charter Medical Corporation, d/b/a Charter Hospital of Mobile. The plaintiff's complaint alleged that the defendants had negligently cared for James Foster and that their negligence had proximately caused Foster's suicide.

FACTS
In 1988, James Foster and his wife of 22 years separated. They later divorced. In the interim, Foster did not adjust well to his marital difficulties. A few days after the separation, he voluntarily entered Doctor's Hospital in Mobile for psychiatric counseling. He was diagnosed as suffering from depression and suicidal ideation.
Upon his discharge from Doctor's Hospital, Foster voluntarily entered Providence Hospital, still suffering from depression. He was discharged from Providence two and one-half weeks later, but reentered *436 Providence the next day because he was suicidal.
Two months after his final release from Providence, Foster attempted suicide by taking a drug overdose. He was admitted to the emergency care facilities of the University of South Alabama Medical Center, where his stomach was pumped in order to save his life. Foster remained at the Medical Center for two days, under observation, and then, on October 27, 1988, he was transferred by ambulance to Charter Hospital, where he entered as a voluntary admittee.
Foster's psychiatrist at Charter, Dr. Defraites, documented Foster's admission criteria as "an inability to function and a danger to self."
During Foster's hospitalization at Charter, the doctor found him to be "highly at risk" of suicide. Foster, however, often denied being suicidal.
According to Charter records, on the order of his doctor, Foster was placed on "suicide precautions" from the time of his admission to Charter on October 27, 1988, until November 2, 1988, and again from November 11, 1988, to November 14, 1988. Foster's medical records indicate that the suicide precautions consisted of orders that Foster was not authorized to leave the Charter grounds, that he be accompanied by a staff person whenever he was outdoors on the Charter grounds, that his room and belongings be searched and any potential weapons removed, that his behavior be checked and recorded on his medical chart every 15 minutes by the Charter staff, and that his time alone be minimized both by encouraging his participation in activities and by moving him to a room with a roommate or to a room near the nurses' station.
On November 19, 1988, five days after the last suicide precautions order had ended, the doctor allowed Foster to leave Charter for a few hours, by issuing him a temporary supervised pass. Foster was released in the care and supervision of his sister.
The doctor testified that as a part of Foster's treatment plan, it was imperative that he be granted temporary release passes. The doctor stated that outings were important in assessing Foster's progress and for Foster's psychological benefit. According to the doctor, Foster felt that he lacked control in his life; the doctor said the temporary releases aided patients like Foster in regaining a sense of control. The doctor further stated that he was aware of the suicide risk in releasing Foster, but that he found the risk to be no greater than the risk posed when Foster was in Charter. The doctor stated, as an example, that if Foster was determined to end his life, he could hang himself in a wooded area adjacent to Charter. However, according to Charter records, while Foster was on suicide precautions his time alone was minimized and he was not allowed to leave the Charter buildings alone.
To aid in assessing the risks posed by a temporary release, Charter staff persons would question the person who accompanied and supervised the patient. This was sometimes done by having the supervising party complete a "temporary pass assessment" form, which elicited detailed information about the patient's behavior. Just how often this form was used for this purpose is greatly disputed. No temporary pass assessment form was completed by Foster's sister when she returned Foster from his first supervised pass (nor was she interviewed by any Charter staff person). The significance of failing to have this form completed by Foster's sister is also greatly disputed.
The doctor testified that he relied solely on the Charter staff to inform him of the success of a temporary release. He stated that he did not rely on the assessment forms for information about adult patients.
Dr. Claude Brown, of the Charter staff, testified that it was "standard practice" for the staff person who checked a patient in from a temporary release to interview the person who had accompanied the patient on the outing. Dr. Brown said that he had never utilized the temporary pass assessment forms for this purpose and that Charter personnel had not procured the completion *437 of this form on any of his patients, to his knowledge.
Eunice Forrest, who had been on the Charter staff for over 19 years, testified that it was standard practice for Foster's doctor and indeed, all Charter doctors, to order that the assessment forms be completed. Nurse Audrey Phillips testified that the assessment form was used "for all patients."
Regarding Foster's release, a notation was made on his chart that it was "uneventful." This notation did not disclose any specific information about the outing. It was discovered some time later that Foster's sister believed that her brother had behaved in an unusually passive manner and that while out on the pass he had dwelled on his marital difficulties.
On November 20, 1988, the day following Foster's first temporary release, his doctor ordered a second supervised pass. Foster was released into the care and supervision of his friend, Bill Jockish, with whom he remained outside the Charter facility for eight hours. Again, no temporary pass assessment form was completed upon Foster's return, nor was Jockish interviewed.
After Foster returned to Charter, a Charter nurse wrote on his progress chart that Foster stated that he was feeling better, but that he continued to speak of emotional pain associated with the divorce.
Bill Jockish stated that Foster was in a highly emotional state both during and after the second temporary release. Jockish said that Foster had expressed suicidal thoughts while out on the pass and that he had cried hysterically. Jockish also stated that Foster's crying continued after he was back in his room at Charter and was so loud that Jockish feared that Foster was disturbing other patients. Jockish added that Foster was so despondent that after returning him to Charter he remained with Foster past visiting hours.
Jockish said that after he left Charter, he phoned Charter and told a staff person that Foster was very upset. He stated that he requested that a staff person check on Foster.
No entry was made on Foster's medical records about Jockish's alleged phone call. The doctor testified that he was advised by a Charter staff person that Foster's visit with Jockish had been "pleasant." In addition, the doctor, on deposition, questioned whether Foster had been upset on that evening, citing that he had spoken to no Charter staff person or patient who had personal knowledge of Foster's alleged crying.
The next morning, on November 21, 1988, the doctor met with Foster and discussed the possibility of an unsupervised outing. According to the doctor, Foster assured him that his two previous releases had gone well and that he would return early if he had any suicidal thoughts. After conferring with another doctor, Foster's doctor authorized an unsupervised, temporary release for later in the day.
At 1:25 p.m., several hours prior to the eventual 6:15 p.m. release, a Charter staff person wrote in Foster's progress notes that Foster was not clean-shaven, that he was "interacting with [a] select few," that he "still appear[ed] depressed," that he "engage[d] in mostly negative conversation," and that he was "focusing on past failures and [did] not make much attempt to set positive goals for the future."
At 4:15 p.m., still prior to the release, Foster asked a Charter nurse for medication for "anxiety." The nurse administered a tranquilizer to Foster and recorded this fact on Foster's medication records. Unaware of the impending unsupervised release, the nurse did not contact the doctor about Foster's request, but she stated that she would have done so had she known about the upcoming release.
At some unspecified time on the day of the release, and prior to the release, a Charter social worker, Rosemary McDavid, spoke with Foster's sister by phone. According to McDavid, Foster's sister was concerned that Foster was not making progress; the sister related that Foster had been passive while in her care on his temporary release and that he had dwelled on his marital problems. McDavid then made *438 a notation of these statements in the doctor's progress notes regarding Foster.
At 6:15 p.m. Foster was released on the unsupervised pass. The Charter staff person who performed the actual release procedure noted Foster's demeanor as "pleasant." At that time, the doctor had spoken with McDavid about her conversation with Foster's sister, but was unaware that Foster had requested and received medication for anxiety; he had not reviewed the 1:25 p.m. progress note indicating that Foster had a negative outlook; and he was unaware of Foster's alleged poor behavior while in the company of Bill Jockish. The doctor was aware that Foster was leaving alone and on foot.
In addition, the evidence does not suggest that the Charter staff person who actually released Foster had reviewed any of this information.
The doctor testified that Charter personnel had both the authority and the duty to cancel a pass if they had reason to believe that it was ill-advised.
The doctor also stated that he did not take steps to notify Foster's family that Foster would be released on an unsupervised pass. In addition, the evidence indicates that Foster's family was not notified prior to the release.
Foster did not return to Charter after his unsupervised temporary release. Charter discharged Foster, against medical advice, because his failure to return violated Charter protocol.
Subsequently, Foster's body was discovered near his then ex-wife's house. Foster had died as the result of a self-inflicted gunshot wound in the early morning hours of the fourth day after his unsupervised release. An icepick and a firearm were discovered near his body.
According to Charter records, Charter learned after Foster's release, in a telephone conversation with his ex-wife, that, while he was out with Jockish, Foster had allegedly threatened to commit suicide. Foster allegedly stated that he would kill himself by shooting himself, by hanging himself, or by jumping from his apartment.
Dr. William Richoux, a licensed psychiatrist testifying on behalf of the plaintiff, stated that Charter had deviated from the standard of care, because, he said, it had failed to procure information about Foster's two supervised passes "in any kind of... systematic or organized fashion, either through having standardized forms filled out, or, in lieu of that, through having interviews conducted by ... Charter ... staff personnel, with the individuals with whom [Foster] had gone on his passes."
Charter corporate representative Toni Green testified that it was Charter's "standard" practice to interview persons accompanying a patient on a temporary release when the patient was returned to Charter. Richoux testified that such an interview is required in order to meet the appropriate standard of care.
Richoux added that Charter had further deviated from the standard of care applicable to facilities like Charter by allowing Foster to be released in the absence of adequate information. Richoux said that appropriately, the doctor and the hospital would share the responsibility for ensuring that adequate information was procured and properly maintained.
In addition, Richoux testified that the doctor had released Foster without obtaining adequate information prior to the release and had thereby deviated from the appropriate standard of care. Richoux added that the doctor had not only failed to be fully informed of Foster's condition, but should have been even more cautious in releasing Foster than is typical practice, because of the timing of the release.
Richoux stated that holidays are a time of particular vulnerability for persons like Foster. The evidence showed that Foster was released during the week of Thanksgiving, and only days after he had been on suicide precautions because, in the opinion of his doctor, he was suicidal.
Also testifying on behalf of the plaintiff, Dr. Susan Glade offered testimony that, in substance, generally corroborated Richoux's.
*439 Testifying for Charter and the doctor, a licensed psychiatrist, Dr. Roy Barnes, stated that he disagreed with Drs. Richoux and Glade as to "what the standard of care called for in this case." Dr. Barnes offered considerable testimony that the defendants had not breached the applicable standard of care.
Similarly, Foster's doctor testified that Foster had improved while in Charter and that at the time of his temporary release he was doing well. The doctor said he had anticipated discharging Foster within a week of the date of the temporary release.

Issues
Kristina Ann Foster, as the administratrix of Foster's estate, sued the doctor and Charter. She alleged in her complaint that the defendants had proximately caused Foster's death by negligently or wantonly failing to provide adequate care; that the defendants did not properly monitor and assess Foster's progress; and that the defendants had wrongly released Foster and that the wrongful release had resulted in his death.
In their respective summary judgment motions, Charter and the doctor recharacterized Foster's complaint as alleging that they had breached a duty to have Foster involuntarily committed. By reframing Kristina Foster's claims, the defendants were able to invoke a body of case law favorable to their positions and the court entered summary judgments for them. See, e.g., Morton v. Jackson Hosp. & Clinic, Inc., 548 So.2d 1015 (Ala.1989) (discussing the issue of a health care provider's duty to obtain an involuntary commitment of a patient).
This was not, in fact, Kristina Foster's position, as stated in her complaint, in her brief in opposition to the summary judgment motions, or on appeal. She stated for example, in her brief in opposition to the summary judgment motions, that "[t]he duty owed by ... [the defendants] does not hinge on whether James Foster was a voluntary or involuntary patient." She went on to say that "this case raises the question of whether ... [the defendants] complied with the standard of care expected of a hospital and of a treating physician regarding the release of a voluntary patient."
Based on a correct characterization of Kristina Foster's claims, we find that the record contains evidence legally sufficient to require the submission of this case for a jury's determination. Therefore, we hold that the trial court erred in entering the summary judgments in favor of the defendants.
A summary judgment is inappropriate where there are genuine issues of material fact. Rule 56, A.R.Civ.P.; Berner v. Caldwell, 543 So.2d 686 (Ala.1989). The party moving for a summary judgment has the burden of making a prima facie showing of the absence of a genuine issue of material fact. Id. Once the movant has made a prima facie showing of the absence of a genuine issue of material fact, then the burden shifts to the non-movant to rebut the prima facie showing. Id. In the medical malpractice context, the test for determining whether the nonmovant has rebutted the prima facie showing that there are no genuine issues of material fact "is whether there was evidence that, when reviewed most strongly in favor of the non-movant... is sufficient to establish that the [health care provider] was negligent and that [this] negligence was the probable cause of the injuries sustained." Parrish v. Russell, 569 So.2d 328, 330 (Ala.1990). If there is such evidence, then a summary judgment is improper. Id. However, "there must be [a showing of] more than a mere possibility or one possibility among others that the negligence complained of caused the injury; there must be evidence that the negligence probably caused the injury." Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala.1985).
Charter and the doctor argue that the summary judgments were proper because Kristina Foster conceded that James Foster had been a voluntary patient. Therefore, they say, they could not have breached a duty to Foster relating to his release; they say they had no real authority to prevent a release, because Foster was *440 free to leave Charter. The defendants say that, absent legally binding control over Foster, they could not have breached a duty relating to an exercise of control over Foster, specifically, the release. We disagree.
The evidence, viewed most favorably to Kristina Foster, shows that, irrespective of whether Charter and the doctor had legally binding control over James Foster, they did have actual control over him.
First, the doctor testified that he gave significant thought to Foster's releases before they occurred. He stated that on the occasion of Foster's last release, he conferred with another doctor before reaching a decision. One might logically conclude, therefore, that Foster's doctor hardly perceived his permission as an empty gesture.
Second, the evidence indicates that Charter personnel did not merely permit Foster to leave, but used Charter procedures for his release and his reentry. This evidence indicates that Charter personnel perceived a measure of control over Foster.
Third, undisputed evidence reveals that Foster never left the Charter facility without the doctor's permission or without submitting to Charter procedures for his release.
Finally, the evidence, viewed most favorably to the plaintiff, does not suggest that Foster would have left Charter without permission or without submitting to Charter's procedures.
For example, aside from the fact that Foster had never left without permission, Foster, according to his doctor, made assurances that logically indicate that Foster bargained for permission to leave. The doctor testified that Foster assured him that his two previous releases had gone well and promised that he would return early if he had suicidal thoughts. This behavior indicates that Foster believed that he needed permission to leave.
In sum, the evidence, viewed most favorably to the plaintiff, indicates that the doctor and Charter had actual control over Foster and were aware that they had such control.
Additionally, Charter and the doctor argue that they could not have breached a duty to Foster because, they say, at the time of his death he was not in their care and therefore, they had no control over Foster at the operative time. This, however, confuses the operative time frame. The question to be resolved is whether, while Foster was in their care, the defendants breached a duty that proximately caused his death, which, in this instance, happened to occur some time after he had left their care.
Similarly, Charter and the doctor argue that Foster's failure to return from the unsupervised release and his act of shooting himself broke the causal chain; the defendants argue that Foster's own acts were the proximate cause of his death.
Whether Charter and the doctor proximately caused Foster's death is a question of foreseeability. See, Popham v. City of Talladega, 582 So.2d 541, 543 (Ala.1991). "[F]oreseeability of a decedent's suicide is legally sufficient ... if the deceased had a history of suicidal proclivities, or manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility of the defendant because of a suicide attempt." Keeton v. Fayette County, 558 So.2d 884, 887 (Ala.1989).
Clearly, Foster produced abundant evidence of not only one, but all three, of the Keeton criteria for proving foreseeability of a suicide.
However, the doctor also argues that expert testimony revealed that one cannot predict, with certainty, when a suicide will occur. This argument is without merit, because, as Keeton implicitly emphasizes, foreseeability is a matter of probabilities, not of certain prediction.
Because we find that there were genuine issues of material fact in this case, and that Kristina Foster produced legally sufficient evidence, i.e., substantial evidence, to support her claims, we conclude that this case must be tried on the merits. Therefore, we *441 reverse the summary judgments and remand the cause.
REVERSED AND REMANDED.
HORNSBY, C.J., and ADAMS, STEAGALL, KENNEDY and INGRAM, JJ., concur.
MADDOX, SHORES and HOUSTON, JJ., dissent.
HOUSTON, Justice (dissenting).
I do not think that there was substantial evidence of a duty on the part of Charter Medical Corporation (considering the evidence most favorably toward Ms. Foster, as administratrix, as our standard of review requires) the breach of which proximately caused Mr. Foster's death. Morton v. Jackson Hospital & Clinic, Inc., 548 So.2d 1015 (Ala.1989). Mr. Foster was voluntarily admitted to Charter. He could leave when he chose to do so. By not returning at the expiration of a three-hour pass, Foster voluntarily discharged himself from Charter. Charter notified Foster's sister and his former mother-in-law of this fact and filed a "missing person" report with the police. Four days later, Foster died of a self-inflicted gunshot wound. No evidence was introduced as to Foster's actions or his whereabouts from 9:00 p.m. on November 21 until November 25. There was no duty on the part of Charter to institute involuntary commitment proceedings against Foster. This Court unanimously rejected that argument in Morton v. Jackson Hospital, supra. In the Morton case, the plaintiff sought compensation for injuries suffered during an attack by a former mental patient, who had been voluntarily admitted to Jackson Hospital and had been released from the hospital less than 24 hours before the attack. Although Morton differs from this case in regard to the relationship of the hospital to the injured party, its holding is controlling. In both cases, the patient was voluntarily admitted. In both cases, there was a recent history of mental treatment. In both cases, the treating psychiatrist authorized the patient's pass (this case) or release (Morton). There was no duty on the part of Charter to seek involuntary commitment of Foster, as there was no duty on the part of Jackson Hospital to seek involuntary commitment of Rendarvis Hunter, the former mental patient who attacked the plaintiff in Morton. The trial court did not err in granting Charter's motion for summary judgment.
In Keeton v. Fayette County, 558 So.2d 884 (Ala.1989), cited by Ms. Foster, Fayette County had a duty to properly supervise, care for, and provide adequate detention for 16-year-old Timmy Keeton, who committed suicide while incarcerated in the Fayette County jail. This distinguishes Keeton from the present case.
In Morton v. Jackson Hospital, Hunter's psychiatrist was not named as a party defendant. There was evidence that does create an inference that Mr. Foster's suicide should have been reasonably foreseen by Dr. Defraites, and that fact distinguishes this case from Keebler v. Winfield Carraway Hospital, 531 So.2d 841 (Ala. 1988). However, in King v. Smith, 539 So.2d 262 (Ala.1989), this Court addressed the issue "[w]hether under the facts of this case Alabama law allows a recovery against a psychiatrist whose negligent diagnosis and treatment of a patient results in the patient's killing himself and two children." The facts in that case were somewhat similar to those in the present case, and this Court held that there was no such duty. Because I cannot in any material way distinguish the summary judgment in favor of Dr. Defraites in the present case from the judgment in King, I would affirm.
MADDOX, J., concurs.