**Samson BYRD, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civil Action No. 3:95–CV–42WS.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Feb. 29, 1996.

Crymes G. Pittman, Pittman, Germany, Roberts & Welsh, Jackson, MS, for plaintiff.

Mitzi Dease Paige, John A. Meynardie, U.S. Attorney's Office, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

This lawsuit was tried before the court sitting without a jury on the dates of February 7, 8 and 9, 1996. Plaintiff here is Samson Byrd, Sergeant First Class, United States Army, retired. The defendant is his prior employer, the United States of America. Aggrieved over the medical treatment he received at the Lyster United States Army Community Hospital in Fort Rucker, Alabama, plaintiff filed a civil complaint against the defendant essentially charging medical malpractice. Plaintiff brings his lawsuit under the provisions of the Federal Tort Claims Act ("FTCA"),[1] Title 28 U.S.C. §§ 1346(b)[2] and 2671–2780.[3] During the course of this three-day trial, this court heard from three witnesses, two called by the plaintiff and one called by the defense. This court also received into evidence a number of exhibits, many of which were medical records of the plaintiff. In this court's eye, the sum total of the credible evidence, both testimonial and documentary, preponderates in favor of the plaintiff. Accordingly, in spite of defendant's arguments to the contrary, this court finds that plaintiff has successfully carried his burden of persuasion. Now, pursuant to the command of Rule 52, Federal Rules of Civil Procedure, this court sets out

---

1. The FTCA, Title 28 U.S.C. § 1346(b), permits the United States to be sued in federal district courts for the negligent or wrongful acts of its employees. The FTCA is a limited waiver of the sovereign immunity of the United States and has been strictly construed in favor of the United States. *Vernell v. United States Postal Service,* 819 F.2d 108, 111 (5th Cir.1987).

2. Title 28 U.S.C. § 1346(b) provides in pertinent part that "the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States for money damages ..., for injury or loss of property, or personal injury or death caused by negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

3. Title 28 U.S.C. §§ 2671–2680 provide for tort claims procedure against the United States Government, including federal agencies and employees acting within the scope of their employment. Title 28 U.S.C. § 2674 provides in part that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

in detail the factual and legal bases for its decision.

## I. *JURISDICTIONAL PREREQUISITE*

■ As a jurisdictional prerequisite to bringing a lawsuit under the FTCA, a plaintiff is required first to present a claim to the appropriate Federal agency. *See* Title 28 U.S.C. § 2675–(a). Congress instituted the presentation requirement "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States." S.Rep. No. 1327, 89th Cong., 2d Sess. 6 (1966), reprinted in 1966 U.S.C.C.A.N. 2515, 2516. Section 2675(a) is satisfied "if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim." *Frantz v. United States,* 29 F.3d 222 (5th Cir.1994); *Adams v. United States,* 615 F.2d 284, 289, clarified, 622 F.2d 197 (5th Cir.1980). In the instant case, the plaintiff presented his administrative claim on January 1, 1994, in accordance with the requirements of Standard Form 95 to the Staff Judge Advocate at Fort Polk, Louisiana, claiming damages due to injury in the amount of $368,000.00. Hence, no one disputes that plaintiff has satisfied the directives of § 2675(a).

## II. *VENUE*

■ The subject claim arises from certain medical care received by the plaintiff Sergeant First Class retired Samson E. Byrd from the Lyster United States Army Community Hospital in Fort Rucker, Alabama ("Fort Rucker"), between January 31, 1992, and July 11, 1992. Plaintiff first filed this action in the Western District of Louisiana, Lake Charles Division, on July 21, 1994, alleging that he had received negligent treatment at Bayne Jones Army Community Hospital, Fort Polk, Louisiana, in early January 1992 and negligent treatment at Fort Rucker from January 31, 1992, until July 11, 1992. Because the plaintiff was still on active duty at the time of his treatment at Fort Polk, the United States District Court for the Western District of Louisiana, Lake Charles Division, found all claims related to the plaintiff's treatment at Fort Polk to be barred by the *Feres*[4] doctrine. The district court for the Western District of Louisiana then concluded that upon the dismissal of plaintiff's Louisiana claims, it no longer was the proper venue for plaintiff's remaining Alabama claims. Thereupon, the district court for the Western District of Louisiana transferred this matter to the Southern District of Mississippi pursuant to Title 28 U.S.C. § 1404(a)[5] which provides that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Of course, the statute's provision referring to districts where the action "might have been brought" merely limits transfer to those districts where the plaintiff could have entertained the suit originally. *Frazier v. Commercial Credit Equipment Corp.,* 755 F.Supp. 163 (S.D.Miss.1991), citing *Hoffman v. Blaski,* 363 U.S. 335, 342–45, 80 S.Ct. 1084, 1089–90, 4 L.Ed.2d 1254 (1960). As provided at Title 28 U.S.C. § 1402(b), "[a]ny civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." The plaintiff resides in Brookhaven, Mississippi, which is within the Southern District of Mississippi. Thus, pursuant to Title 28 U.S.C. §§ 1346(b) and 1402(b), this court has subject matter jurisdiction over this case and the transfer of venue to this forum was proper.

---

4. The government is not liable under the FTCA for injuries incident to military service. *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950). Three rationales support the exception: (1) the "distinctively federal" relationship between a serviceman and his superiors; (2) the ability of servicemen to receive no-fault statutory disability and death benefits; and (3) the need to preserve military discipline and prevent judicial second guessing of military decisions. *United States v. Johnson,* 481 U.S. 681, 688–91, 107 S.Ct. 2063, 2067–69, 95 L.Ed.2d 648 (1987).

5. The change of venue provisions of Title 28 U.S.C. § 1404 apply to actions brought under § 1346(b). *Kephart v. United States,* 242 F.Supp. 469 (E.D.Pa.1965).

### III. PERTINENT FACTS AND MEDICAL HISTORY

On January 13, 1992, Sergeant First Class Samson Byrd, the plaintiff in the instant case (hereinafter "Byrd") was transferred to Fort Polk, Louisiana, where he was to be processed for his final retirement from the United States Army. Upon arrival at Fort Polk, Byrd began to suffer excruciating lower back pain which radiated down into his lower extremities.[6] Byrd sought treatment from Fort Polk base hospital physicians. Upon admission to the Fort Polk base hospital, Byrd's physicians prescribed bed rest, anti-inflammatory drugs, and pain killers. On January 24, 1992, before his retirement processing was final, Byrd left the Fort Polk base hospital on crutches to visit his family in Jackson, Mississippi. On January 25, 1992, while visiting with his family, Byrd says he experienced another severe episode of back pain while he was taking a shower. This time, says Byrd, he fell to the floor and required assistance from family members who took him to St. Dominic Hospital in Jackson, Mississippi, for emergency treatment.

While at St. Dominic Hospital, Byrd was examined by Dr. Lynn Stringer,[7] a neurosurgeon in the Jackson, Mississippi, area. Dr. Stringer's report says that Byrd was suffering "unrelenting back, left hip and leg pain." Further, Dr. Stringer's examination of Byrd revealed "a markedly positive straight leg raising on the left; a positive cross straight leg raising on the right; and a neurological deficit, bilaterally, in Byrd's ankles."

After treating Byrd for pain, Dr. Stringer ordered a non-invasive diagnostic procedure known as a Magnetic Resonance Imaging test or "MRI" of Byrd. The MRI revealed a left-sided herniation of his intervertebral disk at the L–5, S–1 level. In addition, the MRI revealed a bulging disk at the L–3, 4 and L–4, 5 levels. Based on these findings, Dr.

Stringer scheduled Byrd for surgery on January 29, 1992. Because Byrd's retirement status was unclear, Dr. Stringer said he called a local Jackson, Mississippi, Army Recruiter to inquire about payment for Byrd's surgery. The recruiter, says Dr. Stringer, referred the inquiry to Lyster United States Army Community Hospital at Fort Rucker, Alabama, (hereinafter "Lyster Army Hospital"). The Army would not authorize surgery by Dr. Stringer and ordered Byrd to report to Lyster Army Hospital. Thereafter, Dr. Stringer cancelled the surgery and made arrangements to transfer Byrd to Lyster Army Hospital. Dr. Stringer saw to it that Byrd had a copy of his medical records—x-ray reports, lab reports, discharge summary, and the MRI—from St. Dominic Hospital to take with him to Fort Rucker.

On January 31, 1992, when Byrd was admitted at Lyster Army Hospital, he was evaluated by Dr. Jerry Crum who admitted Byrd with a finding of "intermittent low back pain since September, 1991, with radiation down past buttock to mid calf." Further, Dr. Crum made a finding that Byrd had numbness and tingling in the lateral half of his left foot since the 6th of January. The inpatient treatment record (exhibit P–5) written by Dr. Crum dated January 31, 1992, states that Byrd was to be admitted for bed rest and pain control. Dr. Crum's note also says that Byrd was to be evaluated for possible surgery and referred to Dr. Henry Barnard. Dr. Crum's note dated February 1, 1992, states: "Plan bed rest—should consider epidural steroid injection early next week—if that fails, he'll probably need surgery."

The record shows that the St. Dominic medical records were incorporated, at least in part, into Byrd's Lyster Army Hospital medical records. Exhibit D–4, the record of Byrd's treatment at Lyster Army Hospital from January 31, 1992, to February 11, 1992, contains Dr. Stringer's report dated January 30, 1992, which states that "MRI scan was

---

6. According to Byrd, this was not his first experience with lower back pain. Byrd says that in September of 1991, while serving as a sergeant in the United States Army, he experienced lower back pain radiating down into his lower extremities. Byrd says his military physicians prescribed bed rest, anti-inflammatory drugs, and pain killers at the naval hospital in Millington, Tennessee, the base on which he was stationed at that time.

7. Dr. Stringer's findings with regard to Byrd's medical condition are taken from the plaintiff's exhibit P–6.

done showing disk herniation and I felt that the patient was a reasonable candidate for surgical intervention. There has been a great deal of difficulty, however, in having this surgical procedure approved (by the Army) on a civilian basis." Also included in exhibit D–4 is the radiological report from St. Dominic Hospital wherein the radiologist reports that "[a]t L5–S1, there is a left-sided focal disk protrusion which effaces the sac." Byrd's MRI scan conducted at St. Dominic Hospital is not included with the other records in exhibit D–4, but the records that are included clearly show the herniated disk diagnosis and the recommendation for surgery Dr. Stringer says he communicated to Fort Rucker personnel.

As earlier stated, on February 1, 1992, Dr. Crum examined Byrd and found that he had numbness in his left foot. At that time, Dr. Crum told Byrd that he would begin a series of epidural steroid injections, acknowledging that, if they failed, Byrd would probably need surgery (see exhibit P–5, p. 3082). On February 3, 1992, when Dr. Crum prescribed the aforesaid steroid injection, Byrd rejected the treatment and requested the opportunity to talk to the Judge Advocate General [8] in order to determine his retirement status and rights regarding the Army's responsibility for future medical treatment. Dr. Crum's note on February 3, 1992, mentions Byrd's concern that he might be sent home after the epidural injection and lose the opportunity for surgery to correct his problem. Dr. Crum's note states that "I'm not sure he's a good surgical candidate—suspect (he is) seeking 20 gain." This court reads this comment as indicating that Dr. Crum thought Byrd was a malingerer who was trying to enhance his retirement with a disability rating.

On February 5, 1992, after having explained to him the risk and complications of the steroid injections, Byrd agreed to receive the steroid injection. Dr. Crum administered the injection and noted that he would monitor Byrd for the next couple of days, and, if he improved, he would discharge Byrd and follow him up as an out-patient. On February 6, 1992, Dr. Crum noted that Samson Byrd's pain was improving, but he was still having numbness and tingling. Still, Dr. Crum noted that he would discharge Byrd the next day if his situation improved. Byrd was not discharged on February 7, 1992. On that day, Dr. Crum noted that Byrd yet had numbness in the plantar aspect of his left foot. Further, Dr. Crum noted that the Army's Personnel Administration Department had determined Samson's status to be retired.

On February 8, 1992, Dr. Crum noted that Byrd was still complaining of pain in his left hip area and numbness which was now confined to the plantar aspect of his last two toes. Dr. Crum also noted that Byrd had a decrease in the sensation to soft touch of the lateral plantar aspect of his left foot. Further, the straight leg test indicated pain in the hip area at 40 degrees. Byrd was not discharged. On February 9, 1992, Dr. Crum noted the previous day's complaints to be unchanged.

On February 10, 1992, Dr. Crum discharged Byrd from Lyster Army Hospital. Byrd was able to ambulate with the assistance of a walker. Dr. Crum noted that while Byrd's pain in his back was somewhat better due to the steroid injections, Byrd continued to have the numbness and tingling in his lower extremities. Byrd was instructed to return to Lyster Army Hospital for a follow-up examination by Dr. Crum within thirty days. Byrd returned for this examination on March 23, 1992. During this examination, Dr. Crum determined that Byrd had "obtained some relief with epidural steroid injections." Nevertheless, Byrd continued to have chronic low back pain, left leg pain, and numbness in the lateral aspect of his left foot. Byrd says his situation was worse when walking and sitting or standing for long periods of time. Byrd also complained of a burning sensation in the lateral plantar aspect of his left foot and problems with urination. During this visit, Dr. Crum determined that Samson Byrd needed to be scheduled for an electromyography test, lumbar myelogram, and post-myelogram CT scan to follow. Dr. Crum indicated that he would attempt to

---

8. The Judge Advocate General's Corps is the legal arm of the military which provides free of charge the consultative and representational services of military attorneys for servicemen.

arrange all three at the same time in order that Byrd would only have to make one trip.

On April 8, 1992, Samson Byrd was admitted to Lyster Army Hospital for the aforesaid tests. The CT scan of Samson Byrd's lumbar spine indicated a bulging disk at the L3–4 and L4–5 levels, and confirmed a left herniation of Byrd's lumbar disk at the L5–S1 level. The myelogram was scheduled for April 11, 1992. However, it was not done due to equipment problems. Meanwhile, Byrd continued to complain of pain, numbness and tingling identical to his complaints to his physicians in January and February of 1992. Dr. Crum's records state that Byrd was gradually getting better; however, these same records reflect that Byrd was still beset by continued pain, stiffness and other abnormal sensations (residual paresthesia).

On April 23, 1992, Byrd underwent an MRI of the lumbar spine at Flowers Hospital, a civilian facility in Dothan, Alabama, at the request of his Army physician. This MRI revealed a disk herniation at the L4–5 level, with left disk herniation at the L5–S1 level. This test result was virtually identical to the test result of January 29, 1992, at St. Dominic Hospital in Jackson, Mississippi. As a result of the above MRI findings, Dr. Crum scheduled Byrd to undergo a lumbar myelogram with CT scan to follow, and Byrd was discharged from Lyster Army Hospital on April 24, 1992, pending the scheduling of the aforesaid diagnostic procedures. On April 29, 1992, Byrd was readmitted to Lyster Army Hospital where the scheduled tests confirmed a large herniated disk at the L5–S1 level with marked compression of the left S1 nerve root. These tests also confirmed that Byrd's neurological condition continued to worsen after January 27, 1992 MRI ordered by Dr. Stringer St. Dominic Hospital.

On June 17, 1992, Byrd was examined by Dr. Arlen Jahnke as an out-patient. At this visit, Dr. Jahnke scheduled Byrd for surgery with Dr. Henry Barnard on July 7, 1992. On July 7, 1992, Dr. Barnard performed a left side laminectomy and diskectomy at the L5–S1 level. This was the same procedure that had been scheduled by Dr. Stringer back on January 29, 1991. During the procedure, Dr. Barnard encountered numerous very large pieces of disk material which were removed. According to Dr. Barnard's post operative report, the amount of disk material was significant. After this surgery, Byrd was seen as an out-patient by Dr. Barnard who noted that while Byrd's pain was improved, he continued to have persistent numbness in his left foot and lower extremities.

Subsequent to his surgery, Byrd says he experienced a burning pain that would get worse when urinating or defecating. Byrd saw physicians at the VA Medical Center in Jackson, Mississippi, for his continuing problems on several occasions during 1992 and 1993. According to the rehabilitation report at VA Medical Center, Byrd continued to complain of numbness in his foot on the lateral side, on the ball of his foot, and in his last three toes. Electromyography and nerve conduction tests yielded findings of sensory deficits in Byrd's left lower extremities.

In early March of 1993, Byrd says he accepted a job as a truck driver with Bill's Dollar Stores. However, after approximately six months Byrd says he quit this job because he was physically incapable of performing the work due to the continued numbness and tingling in his left leg and foot. After leaving Bill's Dollar Stores, Byrd took a job as a counselor with the Southwest Mississippi Mental Health Complex.

On October 26, 1994, Byrd was examined by Dr. Lynn Stringer who indicated in his notes that Byrd continued to have problems of numbness and burning in the left leg with some back pain. Additionally, Byrd had numbness and burning pain in the left hip during certain exertions including coughing, sneezing, urinating and defecating. Dr. Stringer's examination revealed limited forward flexation, positive straight leg raising, hypoactive ankle reflex on the left as compared to the right, and decreased sensation to pin prick over the lateral foot on the left. Dr. Stringer opined that it was probable Byrd's continued neurological problems were the result of a permanent neural injury that could have been avoided by more prompt surgical intervention. According to Dr. Stringer's note, "there was

an inordinate delay in surgery, perhaps precipitated by 'military red tape.'" Dr. Stringer's note concludes with the observation that "it is probable that his (Byrd's) continued neurological problems are the result of some permanent neural injury that could have been avoided by more prompt surgical intervention."

## IV. *THE EXPERTS' TESTIMONY*

Dr. Lynn Stringer, a neurologist at St. Dominic Hospital, Jackson, Mississippi, was the expert witness for the plaintiff. Dr. Stringer, who examined Byrd in January of 1992, stated that when Army personnel at Fort Rucker, Alabama said they would not authorize surgery at St. Dominic Hospital, but would arrange to transfer Byrd to Lyster Army Hospital, he thought that Byrd was being transferred for immediate surgery. According to Dr. Stringer, he would have insisted on performing the surgery on Byrd if he had known that Lyster Army Hospital personnel were not going to operate right away. Furthermore, said Dr. Stringer, he would have performed the surgery immediately and free, if necessary, because Byrd had already undergone all the conservative treatment his condition required. Dr. Stringer's opinion in regard to the need for immediate surgery was based on the onset of Byrd's pain. Dr. Stringer noted that the onset of Byrd's pain was September of 1991, three months prior to Dr. Stringer's first examination of Byrd in January of 1992. According to Dr. Stringer, most medical literature recommends not waiting more than twelve weeks beyond the onset of pain to operate because the chances of successfully relieving pain and avoiding longstanding problems diminish over time. Given the corroborating report from the radiologist, Dr. Stringer opined that Byrd's need for surgery was immediate, not merely urgent, in January of 1992. Thus, Dr. Stringer concluded that plaintiff's military physicians did not provide the appropriate standard of care because the military did not perform surgery within a reasonable time. Dr. Stringer also opined that the delay of Byrd's surgery probably caused the problems that Byrd currently suffers.

The defendant's expert was Dr. Andrew Parent, a neurologist at the University of Mississippi Medical Center. Dr. Parent did not examine Byrd at any time. Dr. Parent agreed that, where one undergoes twelve weeks of conservative therapy instead of surgery after a clear diagnosis of a herniated disk, the chances of a successful operation are reduced. Dr. Parent also opined that conservative therapy could last at least twelve weeks in cases where there is no firm evidence of neurological deficits. The beneficial effect of bed rest, he stated, is usually apparent within three days to one week. However, Dr. Parent agreed that where, as in the instant case, an MRI scan reveals an obvious herniation of a lumbar disk, other tests such as a lumbar myelogram with CT scan would not be necessary to justify surgery. Dr. Parent believed Dr. Stringer's diagnosis to be a positive one supported by the MRI and the radiology report, as well as by Dr. Stringer's examination of Byrd in January of 1992 which revealed "a markedly positive straight leg raising on the left; a positive cross straight leg raising on the right; and a neurological deficit (hypoactive reflexes), bilaterally, in Byrd's ankles." The report of Dr. Stringer's diagnosis and recommendation for surgery, plus the radiology report from St. Dominic Hospital, were available to Dr. Crum at Fort Rucker on January 29, 1992, as is made evident by exhibit D–4, Byrd's medical records at Lyster Army Hospital for the period from January 29 to February 11, 1992.

As for the three MRI studies performed on Byrd prior to his surgery on July 7, 1992, Dr. Parent noted that Byrd's first two MRI tests showed the same degree of herniation. However, the third MRI, said Dr. Parent, taken in April of 1992, showed a massively protruding disk which had not been reported in previous studies. Dr. Parent agreed that Byrd's condition could have worsened over the three-month period from January 29 to April 29 of 1992, thereby causing additional blockage of the nerve. Byrd's attorney asked Dr. Parent whether a ten-week delay of surgery after the third MRI study was normal practice:

Q: And from my calculations, I determined from April the 29th until this man

had surgery was some ten weeks. Is that your understanding?

A: That is correct.

Q: And do your consider ten weeks appropriate for urgent surgery?

A: That would be unusually long at our institution.

Q: And, in fact, urgent, to me—you would expect in your institution, you would be able to operate on someone within a week, wouldn't you?

A: Yes.

Q: And ten weeks, as you said, is an inordinate delay, is it not?

A: At our institution, it would be, yes.

Q: And when you say your institution, you are talking about the VA Hospital and the Medical Center?

A: The VA Medical Center in Jackson and the University of Mississippi Hospital.

While Dr. Parent subsequently opined that Byrd's treatment at Lyster Army Hospital was reasonable, he did not rule out the delay in Byrd's surgery as the cause of Byrd's continuing pain. Dr. Parent opined that there may have been no unreasonable delay in Byrd's surgery, but that was only if the onset of Byrd's condition was measured from January of 1992 when Byrd entered St. Dominic Hospital and was examined by Dr. Stringer. Dr. Parent admitted that Byrd's medical records supported the contention that the onset of Byrd's condition was in September of 1991 when Byrd says he suffered back pain radiating down into his lower extremities and was prescribed bed rest, anti-inflammatory drugs and pain killers at the naval hospital in Millington, Tennessee.

Finally, Dr. Parent testified that the accepted standards for lumbar disk surgery on an emergency basis are paralysis of acute onset (which Dr. Parent described as someone who walked into the hospital but who could not walk out), intractable pain, and the paralysis or loss of control of one's bladder and bowels.[9] Although Dr. Parent stated that Byrd had none of these symptoms in January and February of 1992, apparently he was not informed that Byrd had walked into

Lyster Army Hospital, but was unable to walk away after discharge without the assistance of a walker.

## V. CONCLUSIONS OF LAW

■■■ Under the Federal Tort Claims Act, the law which controls is that of the state in which the alleged tort occurred. *See Frantz v. United States,* 29 F.3d 222 (5th Cir.1994), citing *Richards v. United States,* 369 U.S. 1, 6–8, 82 S.Ct. 585, 589–90, 7 L.Ed.2d 492 (1962). In the instant case, the plaintiff asserts that the United States Army and its medical personnel at Lyster Army Hospital, Fort Rucker, Alabama, were negligent when they insisted on placing the plaintiff on a regimen of conservative treatment and ignored the plaintiff's need for immediate surgery. Inasmuch at the defendant's alleged acts and omissions took place in Alabama, it is that state's law that controls the instant case.

■■■ Alabama law imposes a legal duty upon doctors to exercise the degree of reasonable care, diligence and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances. *Bradford v. McGee,* 534 So.2d 1076, 1079 (Ala.1988), citing *Keebler v. Winfield Carraway Hospital,* 531 So.2d 841 (Ala.1988), and construing section 6–5–484, Code of Alabama (1975). To recover damages for a breach of this duty, an Alabama plaintiff is required to show by a preponderance of the evidence each of the elements that make up a claim of negligence on the part of the defendant: (1) the standard of care; (2) the doctor's deviation from that standard of care; and (3) proximate causal connection between the doctor's deviation from that standard and the plaintiff's injuries. *Id.,* citing *Ensor v. Wilson,* 519 So.2d 1244 (Ala.1987). Ordinarily, the plaintiff is required to prove these elements through expert testimony. *Levesque v. Regional Medical Center Board,* 612 So.2d 445, 448 (Ala.1993). To establish a physician's negligence, the plaintiff ordinarily must proffer expert medical testimony as to what is or is not the proper practice, treat-

---

9. Dr. Stringer noted that paralysis of one's bladder and bowels is a condition which seldom

occurs and need not be indicated prior to surgery.

ment or procedure. *Complete Family Care v. Sprinkle,* 638 So.2d 774, 777 (Ala.1994). Then, the plaintiff must "adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury." *Bradford v. McGee,* 534 So.2d at 1079. In medical malpractice cases, Alabama law requires the plaintiff to prove that the alleged negligence "probably caused the injury." *McAfee v. Baptist Medical Center,* 641 So.2d 265, 267 (Ala.1994), citing *Parrish v. Russell,* 569 So.2d 328, 330 (Ala.1990) (there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury).

This court is persuaded by the testimony of Dr. Lynn Stringer that the standard of care under the circumstances of Byrd's medical case required surgery in January of 1992. The onset of pain in September of 1991 and the acute onset of symptoms in January of 1992, combined with the MRI scan, the radiology report from St. Dominic Hospital, and the neurological deficit noted by Dr. Stringer, should have convinced Dr. Crum at Lyster Army Hospital that Byrd required immediate surgery. Dr. Henry Barnard was available to perform the surgery at Fort Rucker. Byrd had already undergone all the conservative therapy his medical condition called for by January of 1992. His condition had not improved and, according to Dr. Stringer, only immediate surgery would have met the standard of care at that time. When Dr. Stringer cancelled Byrd's surgery at St. Dominic Hospital, he did so only because he believed Byrd was being transferred to Fort Rucker, Alabama, for the same surgery as he had prescribed. Instead, Byrd was given conservative treatment by a physician who suspected Byrd of being a malingerer attempting to enhance his pending retirement with a disability rating and who even noted this baseless concern in the medical record. Additional unnecessary tests were conducted which only served to corroborate what Dr. Stringer already had diagnosed. Still, Byrd was subjected to more conservative treatment which failed to improve his condition. This court holds that this choice in the face of the plaintiff's obvious hurt, length of suffering, confirmation of injury by his medical records and lack of any evidence showing malingering as suspected by Dr. Crum failed to meet the appropriate standard of care.

The Army's indifference to plaintiff's condition is even more pronounced after April, 1992, when the Army authorized an MRI scan to be performed at Flowers Hospital in Dothan, Alabama. This procedure revealed a massively protruding disk. Even defendant's expert witness, Dr. Parent, acknowledged that at that point plaintiff was in immediate need of surgery. Yet, plaintiff had to wait until July 7, 1992. When Dr. Barnard performed the surgery, he found a badly ruptured disk which had to be removed in pieces. Notwithstanding the court's finding that the defendant violated the appropriate standard of care by not admitting plaintiff to surgery in January of 1992, this court holds that the military's decision to delay plaintiff's surgery from April, 1992, until July 7, 1992, also amounts to a violation of the appropriate standard of care.

The Army's justification for this delay is simply that other patients were scheduled ahead of plaintiff. Additionally, the Army raises Alabama's "justified circumstances" exception to the national medical standard, arguing that Dr. Barnard was only available for surgery on a limited basis. Under Alabama law, one may raise justifiable circumstances as a defense in a medical malpractice case to show the circumstances of medical resources available, thereby permitting an allowance for a local community standard. *See Drs. Lane, Bryant, Eubanks & Dulaney v. Otts,* 412 So.2d 254 (Ala.1982). However, this argument is thoroughly unconvincing in the instant case. The defendant has presented no proof that the patients scheduled for surgery before plaintiff were in immediate need of such. The defendant has presented no proof that it was constrained by any regulations from transferring plaintiff to a civilian hospital for immediate surgery, or that the local civilian hospital was unable to accommodate plaintiff. Instead, the disturbing picture painted by the evidence is that of a United States serviceman who had given his country 20 years of commitment being

ignored in his suffering due to the insouciance of his military doctors and their desire to discharge him before having to operate and possibly provide him a disability rating.

Dr. Andrew Parent acknowledged that at his institution surgery would have been performed at least within ten days of the April MRI scan, and that the delay in surgery of ten weeks was unusually long. Dr. Parent agreed that the ten-week delay from April to July of 1992 probably worsened Byrd's condition and diminished the chance for a fully successful surgery. The MRI scan authorized by the Army to be conducted at Flowers Hospital, Dothan, Alabama, in April of 1992 revealed a massively protruding disk which had not been reported in previous MRI studies, establishing that Byrd's condition had worsened significantly while he was continued on conservative treatment between January and April of 1992. The surgery conducted by Dr. Henry Barnard revealed a badly ruptured disk which was removed in pieces. All this and more persuade this court that the standard of care called for immediate surgery; that Dr. Crum at Lyster Army Hospital deviated from the standard; and that this deviation was the proximate cause of the injuries Byrd claims to suffer.

## VI. *THE MATTER OF DAMAGES*

 Under Alabama law, calculation of the plaintiff's loss requires the finder of fact to consider all elements of that loss, including, but not limited to, medical expenses, pain and suffering, loss of wages, and disability. *Alfa Mutual Insurance Company v. Head,* 655 So.2d 975, 976 (Ala.1995), citing *Powell v. Blue Cross & Blue Shield of Alabama,* 581 So.2d 772, 778 (Ala.1990). A court reviewing a verdict for compensatory damages must determine what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective. *Bridges v. Clements,* 580 So.2d 1346, 1349 (Ala.1991). Review of a verdict for compensatory damages on the ground of excessiveness must focus on the plaintiff (as victim) and ask what the evidence supports in terms of damages suffered by the plaintiff. *Pitt v. Century II, Inc.,* 631 So.2d 235, 239 (Ala. 1993), citing *Bridges v. Clements.*

 In the instant case, Byrd claims he is entitled to damages for future medical expenses, pain and suffering, loss of wages, and disability. Byrd was born on February 28, 1947, and is 49 years old. His life expectancy is 23.5 years according to the *Statistical Abstract of the United States* dated 1991 which is the plaintiff's exhibit 14. According to Byrd's certified vocational evaluation, he cannot perform a full range of medium or heavy work because of his continued back and neurological problems. However, his vocational prognosis of sedentary employment allowing alternation of sitting and standing is good. Until recently, he was employed as a substance abuse counselor with Southwest Mississippi Mental Health Center at a salary of $5.00 per hour. Now, says Byrd, he plans to return to school.

After leaving the Army and recovering from his surgery, Byrd trained to become a commercial truck driver and went to work for Bill's Dollar Stores. His job required him to lift boxes of merchandise. According to Byrd, he had an air cushion driver's seat and he had no problem with his back. However, says Byrd, he continued to suffer tingling and numbness in his legs and a burning sensation when urinating and defecating. He also had sudden onset of urgency to use a rest facility at inconvenient times while he was driving. Therefore, Byrd left his truck driving job.

Based upon Byrd's employment with Bill's Dollar Stores, the economics expert, Dr. Lloyd E. Roberts, Dean of the School of Business at Mississippi College in Clinton, Mississippi, found that Byrd was earning $300.00 per week until he resigned due to his continuing injury. After Byrd's resignation, Dr. Roberts estimated Byrd's earning capacity to be $170.00 per week, or minimum wage. Thus, Dr. Roberts calculated lost income to be $130.00 per week or $6,760.00 per year. Dr. Roberts estimated Byrd's expected work-life to be 14.5 years and concluded that Byrd's total lost income was $78,547.00, allowing for a net discount of three percent. This court cannot agree.

Dr. Stringer and Dr. Parent testified that one who has undergone back surgery such as that performed in the instant case should not

work as a truck driver, especially when lifting is required. This court is persuaded by this testimony and concludes that this employment deleterious to plaintiff's health is not an appropriate basis for damages.

This court asked the parties what evidence had been offered in support of lost wages if this court rejected evidence based on Byrd's employment with Bill's Dollar Stores. The parties agreed that if this court rejected the expert's calculations based on Byrd's employment as a truck driver, then there was no other evidence of lost wages. There was no showing of some period of time Byrd was unable to work or any other undisputed testimony regarding lost wages and hours, *see Griffin v. Battles,* 656 So.2d 1221, 1224 (Ala. Civ.App.1995), and no showing of lost future earning ability. The Alabama Supreme Court has accepted the contention in a Federal Employers' Liability Act case that one's loss of earning capacity may be said to equal the percentage of one's permanent impairment. *See Illinois Central Gulf Railroad v. Russell,* 551 So.2d 960 (Ala.1989) (under FELA it was not error for court to allow employee's attorney to argue, in his closing argument, that employee's loss of earning capacity was same amount as employee's 12% anatomical disability rating). However, such argument was not presented in the instant case. Moreover, Byrd's counsel concedes that it would be too speculative to base loss of future earning capacity upon Byrd's decision to return to school. Therefore, this court finds that no evidence has been presented to show that Byrd suffered a wage loss of $78,547.00 and that claim is hereby denied in its entirety.

■ Byrd also claims $80,000.00 for past pain and suffering. The evidence shows that Byrd's disk herniation continued to worsen over the time his surgery was delayed. Once surgery was performed, the evidence shows that Byrd's disk at L1–S1 was not merely herniated, but was comminuted, broken into multiple fragments. Dr. Barnard's report stated that the amount of disk material was significant and that a Murphy ball was passed beneath the dura and into the foramen in order to be certain that all fragments and loose material had been removed. This evidence provides a clear medical basis for Byrd's complaints of pain. Furthermore,

Byrd offered subjective testimony about his pain and suffering during the time his surgery was delayed. This court has considered all the evidence and finds that the plaintiff's claim of $80,000.00 for pain and suffering is reasonable and amply supported by the record.

■ Next, Byrd claims $150,000.00 for his disability. Dr. Stringer estimated that Byrd suffered permanent impairment of 10% to 15%. However, the defendant has submitted evidence that Byrd would have suffered some measure of impairment anyway, even if surgery had been performed immediately. This court agrees with the defendant.

In the instant case, the evidence shows that Byrd was 45 years of age and had a life expectancy of almost 25 years at the time his surgery was delayed. According to the testimony of Dr. Stringer, Byrd will suffer some measure of permanent impairment as a result of the delay in surgery (between 10 and 15 percent). Byrd has testified that he continues to suffer numbness and tingling in his leg and foot; that he suffers burning sensations during urination and defecation; and that he suffers from the onset of sudden urgency which requires him never to be too far away from a rest facility. Dr. Stringer testified that immediate surgery would have relieved the pressure on the nerve root at the L1–S1 area of Byrd's spine and probably would have prevented the symptoms Byrd now suffers. While this court generally accepts Dr. Stringer's view on this matter, this court is also mindful of Dr. Parent's observation that some intrinsic damage to the nerve root is going to be caused at the time of the initial herniation which surgery cannot correct, even if surgery is performed immediately. Therefore, this court concludes, based upon the evidence presented, that an appropriate and reasonable figure for the plaintiff's future disability would be $100,000.00.

■ Finally, while Byrd claims $25,000.00 for future medical expense, there is nothing in the record to support this claim.

This court finds that the plaintiff is entitled to recover for his pain and suffering and for his disability, albeit less than he has demanded. There shall be no recovery for lost wages or for future medical expenses. Thus, the court finds the evidence to be

980

supportive of an award in the amount of $180,000.00. Review of the Alabama cases shows that this award is not excessive in light of those awards upheld by the Alabama Supreme Court based on similar evidence. These Alabama decisions differ from the instant case only in that the injuries suffered by the respective plaintiffs were caused by sudden accidents, not by delayed surgery for an already existing condition. *See Illinois Central Gulf Railroad v. Russell,* concluding that $300,000 was an appropriate compensatory award under the evidence, which included evidence of a disability brought on by a sudden accident and the plaintiff's evidence of pain and suffering; *Werner v. Henderson,* 600 So.2d 1005 (Ala.1992), affirming award of $667,037.00 for plaintiff's pain and suffering, mental anguish, and permanent injury and disability resulting from a three vehicle accident; and *Pitt v. Century II, Inc.,* 631 So.2d 235 (Ala.1993), affirming a verdict for plaintiff in the amount of $300,000.00 for his past and future pain and suffering, his past and future mental anguish, physical disfigurement, and permanent disability due to leg injuries resulting from a crane accident.

Therefore, a separate judgment shall be entered for the plaintiff in the amount of $180,000.00.

**SO ORDERED AND ADJUDGED.**