147 So. 414

## JACKSON v. BURTON.

### 6 Div. 265.

Supreme Court of Alabama.

March 9, 1933.

Rehearing Denied April 20, 1933.

W. W. Bankhead, of Jasper, and Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

484

Pennington & Tweedy and L. D. Gray, all of Jasper, for appellee.

FOSTER, Justice.

The plaintiff was a girl twelve years old when, on August 13, 1930 (Wednesday) afternoon, around 3 o'clock, she was swinging in a swing in a cow lot, and fell out of it, and broke her left arm, just above the wrist; both bones were broken, and the ends extended through the flesh, and the skin, and became covered with soil and dirt from the lot. This was near Bankhead mines in Walker county, where her father was employed. The company doctor, Dr. Price Clayton, reached her twenty or twenty-five minutes after the accident. He did not treat her at all, but brought her immediately to the Walker County Hospital at Jasper. The defendant was president of the hospital corporation, and Dr. Clayton put her under the care and treatment of defendant at the hospital. He was present and observed the treatment given by defendant; and discussed with him, and recommended a certain character of treatment which they call a wet dressing. He also said that the advantage of that treatment is to aid drainage, and it tends better to keep the wound open so the infection is not dammed up, and permits oxygen and air to get to where the germ is likely to be, which is such that it must be without air to grow and multiply; that what is called dry dressing has a tendency more likely to seal up the wound and exclude the air; that the wet dressing should continue until the period of incubation of the germ had passed. Gas gangrene is an infectious germ which exists in such a lot, and it is likely to infect a wound in contact with the ground in such a place. When so, it should be anticipated and treatment made with that in view. The germ follows the tissues. The period of incubation ranges from six hours to several days. It then progresses rapidly, and, if not promptly and effectually stopped, will cause death. If it has made much progress up the arm before it is discovered or checked, amputation at a sound unaffected portion of the arm is necessary. This was done for plaintiff at about 7 or 7:30 Saturday morning.

The doctors do not question its necessity at that time. But the claim is made that defendant was negligent in the proper treatment in the first instance, in that he used the dry process, when he should have used the wet; also that while he dressed the arm on Friday morning, he did not see her again until he was called by the supervisor of nurses at the hospital about 6 o'clock Saturday morning, and that no other competent person examined her in the meantime. The nurse then detected the progress of the infection. Defendant came at once, and saw the necessity of an immediate amputation at the shoulder, and performed the operation, and the child recovered, without the arm.

The claim is that on Friday afternoon she showed the manifest signs of the infection, which would have been discovered by defendant had he examined her that afternoon or night, but neglected his duty in that respect. He claims that he did examine her several times, and the hospital chart showed that he made an examination Friday afternoon. But there was substantial evidence to the contrary, on which there was a sharp conflict. Plaintiff insists that such neglect is the chief cause upon which the action is based.

The first question is the claim that defendant was due the affirmative charge.

The experts agree that the circumstances of the accident known to defendant suggested the probability of such infection, known to be very dangerous and of rapid growth after incubation. Such knowledge, all admitted by defendant, demands frequent examination and radical treatment. It is also shown in one aspect of the evidence that symptoms of the existence and progress of the infection are manifest to a competent physician but not to one unskilled in such matters.

One of the most manifest symptoms is said to be a strong and peculiarly offensive odor, distinct from any other, which is accompanied with fever and restlessness. There was substantial evidence that on Friday afternoon the wound did emit a strong and offensive odor, and that the patient had fever and was restless. But early the next morning the infection had extended past the elbow. That circumstance and evidence of her symp-

toms Friday afternoon and night were such as to justify an inference that the infection on that afternoon could and would have been detected by a competent person, when prompt and efficient treatment would probably have stopped its progress and prevented the necessity of amputation.

Certainly defendant is insistent that he did make the examination, and no such infection was discoverable, and that if then discovered, amputation would have been the proper treatment. But whether he made such examination was disputed, and was a question for the jury. It was properly left to the jury.

The rule is stated on good authority, and we approve it, that when a physician has undertaken the treatment of a patient whose condition, known to the physician, is such that without continuous or frequent expert attention, he is likely to suffer injurious consequences, he must either render such attention himself or see that some other competent person does so. Herzog on Med. Jur. § 188; see generally on the subject of 'diligence by a physician; Torrance v. Wells, 219 Ala. 384, 122 So. 322; Thaggard v. Vafes, 218 Ala. 609, 119 So. 647; 49 Corpus Juris 1121 et seq.

There is evidence that no competent person examined the patient Friday afternoon. Because we think the jury could find that if such an one had examined the patient Friday afternoon or night, the infection would or should have been discovered, and, further, could find that defendant himself neglected to do so, or to see that another did, and for about twenty hours no such examination was made, and that within such time the infection manifested itself, through the ordinary symptoms of such disease, the question of defendant's negligence was a fair issue for the jury. Some testimony indicated that the proper treatment as soon as detected was amputation; other testimony was that, if detected soon after incubation, and it was then localized, there could be applied treatment which would probably have prevented amputation. The necessity for frequent and skillful examinations was intensified by the grave danger of such infection, and some proof was that it should have been done every eight or ten hours.

Appellee insists that the refused charges do not appear to have been requested by appellant. But we have held that when the record is silent in this respect, we presume the clerk complied with the requirements of the law, and only set out in the record charges refused to appellant, for none other need be shown in the record. Section 9509, Code; Townsend v. Adair, 223 Ala. 150, 134 So. 637.

Refused charge No. 57 is that, "If the jury believe the evidence they cannot find for the plaintiff because defendant used dry bandage in dressing plaintiff's injury."

The gravamen of both counts of the complaint is negligence, not the want of skill. The rule of law under such circumstances is that: "Where there are various recognized methods of treatment the physician is at liberty to follow the one he thinks best, and is not liable for malpractice because expert witnesses give their opinion that some other method would have been preferable." Herzog on Med. Jur. § 183; 48 Corpus Juris 1124, 1127; Carraway v. Graham, 218 Ala. 453, 118 So. 807; Barfield v. South Highlands Infirmary, 191 Ala. 556 (27), 68 So. 30, Ann. Cas. 1916C, 1097.

The experts all agreed that the wet and dry methods in such cases are both used by skillful physicians, and that standard authorities approve them both; that it is largely in the sound discretion of the surgeon in charge of the case. Defendant was shown to have been a competent surgeon and used the method adopted by him with care and skill, and the wound continued to drain to the last, and did not seal up. This is the result the best process was expected to secure. For so doing, he is not chargeable with a want of due care (that is, negligence), and the refused charge No. 57 should have been given. It was prejudicial error to refuse it.

We do not think it is necessary to discuss other assignments, as they are not likely to occur on another trial in the same form.

Reversed and remanded.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.