Charles Keebler committed suicide while being detained in the Winfield City Jail. Suit was filed by his administratrix, Fannie Keebler. The City of Winfield and certain of its employees entered into a pro tanto settlement with the plaintiff and were dismissed as defendants. Winfield Carraway Hospital, Dr. Mike Hall, and Lilly Musgrove, a nurse, were the other defendants in the case, which proceeded to trial as a wrongful death medical malpractice case. The trial court granted defendants' motion for directed verdict at the close of plaintiff's evidence. The plaintiff, Mrs. Keebler, appeals. We affirm.
This action was pending in the courts of this state prior to June 11, 1987; therefore, § 12-21-12, Code of Alabama 1975, as amended does not apply, and the applicable standard of review is as follows:
 "`A motion for directed verdict or JNOV is tested against the scintilla rule, which requires that a question go to the jury "if the evidence or any reasonable inference arising therefrom, furnishes a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint." Alabama Power Co. v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). In reviewing a trial court's ruling on these motions, the appellate court, guided by the standard of the scintilla rule, determines whether there was sufficient evidence below to produce a conflict warranting jury consideration. Baker v. Chastain, 389 So.2d 932 (Ala. 1980). Like the trial court, the appellate court must view all the evidence in a light most favorable to the non-moving party. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982).'" *Page 843 
Peete v. Blackwell, 504 So.2d 222, 224 (Ala. 1986) (quotingHammond v. City of Gadsden, 493 So.2d 1374, 1376 (Ala. 1986)).
The dispositive issue is whether the hospital, Dr. Hall, or Nurse Musgrove owed plaintiff's intestate a duty of care at the time he committed suicide.
On May 31, 1981, Officer Vaughn of the Winfield Police Department accompanied a rescue team to a motel, where they found Charles Keebler lying in bed and complaining of chest pains. The rescue squad and Officer Vaughn brought Keebler to the emergency room at Winfield Carraway Hospital and left him under the care of the attending physician, Dr. Hall, who admitted Keebler to the emergency room and then diagnosed his illness as stemming from probable alcohol abuse, possible drug abuse, and chest pains. Dr. Hall learned from Keebler's son, who had been with his father at the motel, that Keebler had been drinking alcohol and could have ingested Valium. Because Keebler was energetic and unruly, Dr. Hall inferred that he had not consumed dangerous quantities of Valium, which is a sedative. Nevertheless, Dr. Hall took precautionary measures and prescribed a treatment to prevent a drug overdose. Dr. Hall inserted a tube into Keebler's nose and down to his stomach in order to remove any noxious drugs. Dr. Hall also prescribed a laxative to induce a discharge of any drugs lodged in his intestinal tract and an activated charcoal compound to absorb chemicals before they entered the bloodstream. To determine the gravity of Keebler's chest pains, Dr. Hall tested his blood pressure and made an electrocardiogram. The results of both tests were normal. Dr. Hall then administered an injection of nitroglycerin to alleviate Keebler's chest pains. Dr. Hall also examined Keebler's eyes and found nothing wrong. Because Mr. Keebler was being uncooperative, Dr. Hall ordered a sedative, Librium, and restraints if necessary.
Since Mr. Keebler continued to be disorderly and refused to enter his hospital room, Dr. Hall instructed a nurse to call the police. Officer Vaughn returned to the emergency room approximately one hour and fifteen minutes after his initial visit and found "Mr. Keebler talking on the telephone and walking around." He said that the nurse on duty, Mrs. Musgrove, told him that Mr. Keebler "had been disturbing everybody in the hospital . . . and that they couldn't do anything with him, the doctor had already checked him and couldn't find anything wrong with him and wanted us to remove him." Officer Vaughn told Keebler that he would have to go to his room, and, if he did not, that he would take him to jail. Keebler replied by saying that he could do whatever he wanted. After explaining to Keebler that the hospital was dismissing him, Officer Vaughn brought him to the city jail. Keebler offered no resistance. Officer Vaughn testified that Keebler "definitely had been drinking" and was "disorderly in my presence at the hospital." Officer Vaughn further testified that he arrested Keebler on his own and without orders from Mrs. Musgrove or Dr. Hall. Dr. Hall became aware of Keebler's dismissal from the hospital later, when he read and signed the emergency room record, which stated: "Disposition — to jail with police." When asked on direct examination whether he thought Keebler possessed the mental capacity to decide for himself whether to go to jail or to receive further treatment, Dr. Hall responded that Keebler was of sufficient mind to make such a decision.
When Officer Vaughn arrived at City Hall, he locked Keebler in a jail cell and left him unattended. A couple of hours later, at the request of Keebler's daughter and his wife, who had both come to the jail to check on Mr. Keebler, Officer Vaughn went to Keebler's cell; he found Keebler unconscious, slumped over behind the bars with one end of a T-shirt tied around his neck and the other end tied to a bar of the jail door. Upon examining Keebler, the police found no pulse and determined that his breathing had ceased. Dr. Augilar, the pathologist who performed the autopsy, attributed the death to asphyxiation. At trial, based on his findings during the autopsy and the circumstances surrounding Keebler's death, Dr. Augilar testified that Keebler *Page 844 
had committed suicide by hanging himself.
Plaintiff's medical expert, Dr. Holcomb, criticized Dr. Hall for allowing Keebler to leave the hospital with possibly a dangerous mixture of Valium and alcohol still in his system. Dr. Holcomb testified that "allowing the patient to leave the hospital and not making provisions to bring him back violated the standard of care." Essentially, plaintiff, through her medical expert, contends that Dr. Hall and the hospital abandoned their duty of care toward Keebler. However, this argument presupposes that Dr. Hall and the hospital owed Keebler a duty to continue medical treatment after he left the emergency room; the existence of such a duty depends on whether Dr. Hall knew that Keebler was likely to commit suicide. SeeJackson v. Burton, 226 Ala. 483, 147 So. 414 (1933). We have held that proof of the existence of a duty owing from the defendant to the injured party is a prerequisite for proving negligence or wantonness, Alabama Power Co. v. Laney,428 So.2d 21 (Ala. 1983), and that the question of whether a legal duty exists is essentially a question of law for the court, Rose v.Miller Co., Inc., 432 So.2d 1237 (Ala. 1983), to be resolved by determining whether the injury was foreseeable. Buchanan v.Merger Enterprises, Inc., 463 So.2d 121 (Ala. 1984); Bush v.Alabama Power Co., 457 So.2d 350 (Ala. 1984); Havard v. Palmer Baker Engineers, Inc., 293 Ala. 301, 302 So.2d 228 (1974), overruled on other grounds, Ex parte Insurance Company of NorthAmerica, 523 So.2d 1064 (Ala. 1988). While the Alabama courts have never applied the abandonment-of-duty concept to a situation like that here, in which a patient commits suicide after a physician renders medical treatment, the California appellate courts have addressed this issue and have explicitly held that a doctor or a hospital has a duty to take preventive measures when they have knowledge of facts from which to reasonably infer that a patient may be likely to attempt suicide. Vistica v. Presbyterian Hospital Medical Center ofSan Francisco, 67 Cal.2d 465, 62 Cal.Rptr. 577, 432 P.2d 193
(1967); Bellah v. Greenson, 81 Cal.App.3d 614, 146 Cal.Rptr. 535
(1978); Nally v. Grace Comm. Church of the Valley,194 Cal.App.3d 1147, 195 Cal.App.3d 956A, 240 Cal.Rptr. 215 (1987), review granted, Nally v. Grace Comm. Church of theValley, 243 Cal.Rptr. 86, 747 P.2d 527 (1988).
The New Jersey Supreme Court has reached a similar conclusion. In Fernandez v. Baruch, 52 N.J. 127, 244 A.2d 109
(1968), the widow of the deceased Pedro Fernandez brought a wrongful death action against two psychiatrists, alleging that malpractice on their part caused the suicide of her husband. The police had arrested Pedro Fernandez and had taken him to a hospital, where two psychiatrists, Judd and Baruch, diagnosed him as suffering from mental illness and as having violent and homicidal tendencies. Because of insufficient facilities to treat Fernandez on a long-term basis, 18 days after his arrival the hospital returned him to the custody of the police. At the time of his release from the hospital, Fernandez was calm and rational. Four days later, while confined in jail, he hanged himself with his elastic socks.
At trial, the jury returned a verdict for the plaintiff. However, the appellate court reversed the trial court's judgment based on the jury verdict and remanded the cause to the trial court for entry of judgment for the defendants. In reaching this decision, the Court stated:
 "The controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself. See Annotation, Civil Liability for Death by Suicide, 11 A.L.R.2d 751, 782-92 (1950) and cases cited therein. Since there was no proof that generally accepted medical standards required the defendant doctors to conclude that Fernandez was likely to attempt suicide, they cannot be said to be guilty of malpractice in not predicting to the police that the decedent might attempt to do away with himself. See Perr, Suicide Responsibility of Hospital and Psychiatrist, 9 *Page 845 
Clev.-Mar.L.Rev. 427 (1960); see generally, Morse, The Tort Liability of the Psychiatrist, 18 Syracuse L.Rev. 691, 707-15 (1967).
". . . .
 "Because the evidence failed to show that the decedent had a suicidal proclivity of which the defendant doctors were or should have been aware, we conclude that no case of malpractice was presented against them."
244 A.2d 109 at 112. (Emphasis added.)
Making a physician's duty to guard against a suicide conditional on its foreseeability is a prudent rule and one consistent with our own decisions. In Mobile Infirmary v.Eberlein, 270 Ala. 360, 369, 119 So.2d 8, 17 (1960), we stated that "ordinarily no one is required to guard against or take measures to avert that which a reasonably prudent person under the circumstances would not anticipate as likely to happen." InJackson, supra, a medical malpractice case in which we addressed the issue of whether a physician abandoned his duty to render medical treatment at a critical stage of a patient's illness, we stated: "[W]hen a physician has undertaken the treatment of a patient whose condition, known to the physician, is such that without continuous or frequent expert attention, he is likely to suffer injurious consequences, he must either render such attention himself or see that some other competent person does so." 226 Ala. at 485, 147 So. at 416.
In the case sub judice, Mrs. Keebler failed to introduce any evidence indicating that Dr. Hall should have reasonably foreseen her husband's suicide. Although Dr. Holcomb testified that the combined effects of alcohol and Valium pose a calculable risk that a patient may attempt suicide, this evidence does not create an inference that Mr. Keebler's suicide should have been reasonably foreseen by Dr. Hall. Mrs. Keebler had the burden to show through expert testimony that Dr. Hall breached his duty to exercise such reasonable care, diligence, and skill as reasonably competent physicians in the national medical community ordinarily would in the same or similar circumstances. Code 1975, § 6-5-484 (a). Drs. Lane,Bryant, Eubanks Dulaney v. Otts, 412 So.2d 254 (Ala. 1982);Dobbs v. Smith, 514 So.2d 871 (Ala. 1987). Mrs. Keebler predicates her malpractice claim on the theory that Dr. Hall should have foreseen her husband's imminent self-destruction and then should have taken precautionary measures to prevent it from happening. However, Dr. Holcomb's testimony did not satisfy the "unique quality of proof of the alleged wrongdoing" required in medical malpractice cases. Hines v. Armbrester,477 So.2d 302 (Ala. 1985). Dr. Holcomb did not testify as to the national medical standard of care. Specifically, Dr. Holcomb did not testify that reasonably competent physicians within the national medical community when treating a patient who had ingested Valium and alcohol would view suicide as a reasonably foreseeable contingency to be guarded against, and that Dr. Hall breached the standard of care ordinarily exercised by other physicians in the national medical community by failing to foresee and to guard against Keebler's suicide. Moreover, the record did not indicate that Keebler had a history of suicidal proclivities, that he manifested suicidal proclivities while at the hospital, or that he was admitted due to a suicide attempt. Arguably, such facts as these, if known to Dr. Hall, would have rendered the contingency of suicide reasonably foreseeable. See Knuth, Civil Liability for Causing or Failingto Prevent Suicide, 12 Loy.L.A.L.Rev. 967, 991 (1979). Thus, Mrs. Keebler failed to meet her burden. The evidence presented at trial did not create a fact question as to whether Dr. Hall should have foreseen Mr. Keebler's suicide. Therefore, the trial court correctly ruled, as a matter of law, that Dr. Hall was under no duty to render "continuous attention" to prevent the "likely" occurrence of Keebler's suicide. Jackson, supra.
Solely with regard to the liability of defendants Nurse Musgrove and Carraway Hospital, the plaintiff's medical expert testified that the nurse's failure to execute all of Dr. Hall's orders constituted a breach of the hospital's duty to exercise reasonable *Page 846 
care. In view of the fact that the plaintiff failed to prove the existence of a duty, this evidence is irrelevant.
Because we predicate our finding that the plaintiff failed to establish a prima facie case of negligence on the ground that Dr. Hall, Nurse Musgrove or the hospital was not shown to have owed Keebler a duty to exercise reasonable care at the time of his death, we pretermit discussion of the issue of whether the trial court committed reversible error in excluding testimony on the question of proximate cause.
For the foregoing reasons, we hold that the trial court properly directed a verdict for the defendants.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON and BEATTY, JJ., concur.