793 So.2d 730 (2000)
Felicia H. HAUSEMAN
v.
UNIVERSITY OF ALABAMA HEALTH SERVICES FOUNDATION and Dr. Albert D. Pacifico.
1990084.
Supreme Court of Alabama.
November 3, 2000.
Rehearing Denied March 30, 2001.
*731 Stephen D. Heninger and R. Edwin Lamberth of Heninger, Burge, Vargo & Davis, L.L.P., Birmingham, for appellant.
Randal H. Sellers and Joseph L. Reese, Jr., of Starnes & Atchison, L.L.P., Birmingham, for appellees.
BROWN, Justice.
The plaintiff, Felicia Hauseman, appeals the circuit court's summary judgment entered in favor of the defendants Dr. Albert Pacifico and the University of Alabama Health Services Foundation ("UAHSF").
Margaret B. Hicks[1] was admitted to the University of Alabama at Birmingham Hospital ("UAB Hospital") and underwent coronary by-pass surgery on August 30, 1996. Her surgeon was Dr. Albert Pacifico, who routinely performed this kind of procedure. Dr. Pacifico was assisted by his cardiovascular-surgery team, consisting of Dr. Chris Akins, the chief resident; Dr. Don Cleveland, the junior cardiac resident; and Dr. Rosensteel,[2] the general-surgery resident.
Mrs. Hicks's surgery was successful, and on September 4, 1996, she was discharged from UAB Hospital. However, because of Mrs. Hicks's age and frailty, she was sent to Spain Rehabilitation Center ("Spain Rehab") for cardiac rehabilitation. It was common for elderly or weak patients to be discharged from UAB Hospital to Spain Rehab for additional rehabilitation and/or supportive care. When she was transferred to Spain Rehab, Mrs. Hicks was clinically and medically stable.
Although Mrs. Hicks had been discharged from UAB Hospital, Dr. Pacifico was not "through with her care"; he was available to see Mrs. Hicks at Spain Rehab if he was called and asked to do so. Once at Spain Rehab, Mrs. Hicks was placed in the care of Dr. Christopher Kim and Dr. Chi-Tsou Huang. On September 6, Mrs. Hicks's body temperature was 103.8&;~ she also had an elevated white-blood-cell count of 14,800. On September 7, Dr. Rosensteel went to Spain Rehab and examined Mrs. Hicks. Dr. Rosensteel's note stated: "If patient's condition decompensates, will come evaluate the patient." The following day, Mrs. Hicks's white-blood-cell count rose to 16,800. Based on this, Dr. Huang suspected that Mrs. Hicks had developed *732 some kind of infection. A note on Mrs. Hicks's chart, dated September 15, stated: "The sternal wound drains yellowish, turbid discharge quite a lot. CV [cardiovascular team] is aware of it." The next day, doctors at Spain Rehab removed the sternal staples from Mrs. Hicks's chest and pus gushed out. Dr. Huang instructed Dr. Kim to call Dr. Pacifico's team and advise them of the wound status. When Dr. Kim telephoned, he spoke with one of Dr. Pacifico's residents, who advised him that a member of Dr. Pacifico's team would come to see Mrs. Hicks. On September 17, Dr. Huang noted in Mrs. Hicks's chart: "patient wants CV surgery to come and check her wound." The next day, Dr. Huang spoke with Dr. Akins, who told him that a member of Dr. Pacifico's team would come and check Mrs. Hicks. Dr. Huang made several additional notes on Mrs. Hicks's chart concerning requests to the cardiovascular-surgery team to examine Mrs. Hicks and the team's failure to do so.
All of the telephone calls made by Drs. Kim and Huang requesting that the cardiovascular-surgery team see Mrs. Hicks were made to resident physicians only; no calls were ever made directly to Dr. Pacifico. Dr. Pacifico did not know that the physicians at Spain Rehab had requested that a physician from the cardiovascular-surgery team see Mrs. Hicks. Dr. Pacifico did not see Mrs. Hicks after her discharge from UAB Hospital on September 4, nor did he have any conversations with any of the physicians at Spain Rehab or any of the cardiovascular-surgery-service residents about Mrs. Hicks after her discharge from UAB Hospital on September 4. Dr. Pacifico testified during his deposition that if anyone from his team had seen Mrs. Hicks, that person would have recommended that a plastic surgeon be called in to consult. According to Dr. Pacifico, this would be the specialist best suited for the surgical management of a sternal-wound infection.
Mrs. Hicks was seen by personnel from the infectious-disease and plastic-surgery services on September 19 and 20, respectively. Mrs. Hicks was determined to have a sternal-wound infection. On September 21, 1996, Mrs. Hicks was transferred from Spain Rehab to UAB Hospital. Mrs. Hicks's sternal-wound infection was managed by the plastic-surgery service, rather than the cardiovascular-surgery service. Mrs. Hicks underwent surgical treatment for the sternal-wound infection on September 24 and again on September 27. On October 24, Mrs. Hicks died of multiorgan system failure secondary to sepsis.
On March 15, 1997, Felicia Hauseman, Mrs. Hicks's daughter and administrator of her estate, filed a medical-malpractice action against UAHSF, Dr. Pacifico, Dr. Kim, and Dr. Huang. Each defendant moved for a summary judgment. On May 25, 1999, the trial court granted Dr. Huang and Dr. Kim's motions for summary judgment, and entered a final judgment for those defendants, pursuant to Rule 54(b), Ala.R.Civ.P. No notice of appeal was filed from that judgment.
On September 23, 1999, the trial court issued the following order with regard to UAHSF and Dr. Pacifico's motion for summary judgment:
"ORDER
"This matter is before the Court on the Motion for Summary Judgment filed by defendants University of Alabama Health Services Foundation, P.C., and Albert D. Pacifico, M.D.
"Defendants contend that they have absolute or qualified immunity. Plaintiff contends that Dr. Pacifico is liable for his own negligence and for the negligence *733 of the residents under his supervision and control.
"Plaintiff contends that the residents were loaned or borrowed servants and they were working for Dr. Pacifico and not for UAB. Plaintiff further contends that the residents were not performing a discretionary public function. Plaintiff argues that the treatment was at a private hospital and, therefore, there was no public function.
"It appears from the evidence presented that the residents were performing a discretionary function in the care and treatment of the patient. The evidence is that the residents were performing duties through the residency program at UAB.
"It appears to this Court that there was qualified or discretionary immunity for such residents. Where the agent is not liable, the principal cannot be held liable either. Gore v. City of Hoover, 559 So.2d 163 (Ala.1990). Therefore, Dr. Pacifico could not be held liable for the negligence of the residents where they have immunity.
"Plaintiff also contends that Dr. Pacifico should be held liable for his own negligence by failing to continue the treatment of the patient. Plaintiff contends that Dr. Pacifico had a duty to make sure `that if something goes wrong with some of his patients, he's going to know about it.'
"In McKowan v. Bentley, 773 So.2d 990 (Ala.1999), it was held that where the doctor knew of the patient's postoperative infection and did not properly manage her post-operative care, he could be liable.
"The rule is that when a physician has undertaken the treatment of a patient whose condition, known to the physician, is such that without continuous or frequent expert attention, he is likely to suffer injurious consequences, he must either render such attention himself or see that some other competent person does so. Jackson v. Burton, 226 Ala. 483, 147 So. 414 (1933).
"In this case there is no evidence that Dr. Pacifico knew of the patient's postoperative condition which required further attention.
"Therefore, the Motion for Summary Judgment filed by the defendants University of Alabama Health Services Foundation and Albert D. Pacifico, M.D., are granted."
(R. 263-64.)
On October 5, 1999, Hauseman filed a notice of appeal from the summary judgment for UAHSF and Dr. Pacifico.
Because this appeal is from a summary judgment, our review is governed by the following standard:
"In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was `entitled to a judgment as a matter of law,' Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is `substantial' if it is of `such weight and quality that fairminded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting *734 West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).

I.
Hauseman contends that the summary judgment for UAHSF and Dr. Pacifico was improper as to her malpractice claim against Dr. Pacifico based on his own acts and omissions.
"To prove liability in a medical malpractice case, the plaintiff must prove (1) the appropriate standard of care, (2) the doctor's deviation from that standard, and (3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff." Looney v. Davis, 721 So.2d 152, 157 (Ala.1998). See Complete Family Care v. Sprinkle, 638 So.2d 774 (Ala.1994); Bradford v. McGee, 534 So.2d 1076 (Ala.1988); and § 6-5-484, Ala.Code 1975. To defeat a properly supported motion for a summary judgment on a medical-malpractice claim, the nonmovant ordinarily must present testimony from a "similarly situated" medical expert. Levesque v. Regional Med. Ctr. Bd., 612 So.2d 445, 449 (Ala.1993).
Hauseman appears to claim that because Dr. Pacifico was aware that a sternal-wound infection was a potential complication in surgeries such as the one performed on Mrs. Hicks, he had a duty to provide treatment, despite the fact that no evidence indicated that Dr. Pacifico was ever made aware that Mrs. Hicks had developed an infection or indicated that Dr. Pacifico had been asked to come to Spain Rehab to examine Mrs. Hicks. Hauseman offered no expert testimony indicating that Dr. Pacifico breached the applicable standard of care by failing to personally see or treat Mrs. Hicks at Spain Rehab in the absence of a request to do so. Certainly, had Dr. Pacifico been aware that Mrs. Hicks was suffering from a postoperative sternal-wound infection, he would have had a duty to manage that infection. See McKowan v. Bentley 793 So.2d 990 (Ala.1999). However, the only criticism Hauseman's expert witness, Dr. Michele Cerino, offered against Dr. Pacifico did not concern any direct acts or omissions. Rather, Dr. Cerino was critical of Dr. Pacifico because his "staff" had failed to answer calls for consult requests. Dr. Cerino testified that by using the word "staff," he was referring to the cardiovascular-surgery-service residents working with Dr. Pacifico.
Because Hauseman offered no expert testimony indicating that Dr. Pacifico breached the applicable standard of care by failing to personally see or treat Mrs. Hicks at Spain Rehab in the absence of a request to do so, there was no genuine issue as to any material fact. Therefore, the trial court properly entered the summary judgment in favor of Dr. Pacifico and UAHSF on Houseman's malpractice claim against Dr. Pacifico based on his own acts and omissions.

II.
Hauseman also contends that the summary judgment in favor of UAHSF and Dr. Pacifico was improper as to her malpractice claim against Dr. Pacifico based on the theory that he had vicarious liability *735 for the acts and omissions of the residents on his "team."
The trial court entered the summary judgment against this claim on the basis that the residents were entitled to qualified or discretionary-function immunity and, therefore, that Dr. Pacifico could not be held liable for their acts and omissions. Hauseman argues that the trial court's ruling is erroneous for two reasons: (1) because, she says, Dr. Pacifico and UAHSF failed to produce substantial evidence indicating that the residents were entitled to qualified or discretionary-function immunity; and (2) because, she says, she produced uncontroverted evidence indicating that the residents were not performing a "discretionary public function" that would entitle them to immunity.
In Ex parte Cranman, 792 So.2d 392 (Ala.2000), this Court traced the evolution of State-agent immunity, restated the law of State-agent immunity, and suggested the formulation of a new test for determining when State employees sued in their individual capacities would be entitled to the benefits of State-agent immunity:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405. Although Cranman was only a plurality decision, this Court subsequently adopted that proposed test in Ex parte Butts, 775 So.2d 173, 177-78 (Ala. 2000).
The resident physicians' treatment of Mrs. Hicks does not fit within any of the categories of immune State-agent conduct set out in the Cranman restatement. Thus, although they were State-employed physicians, the residents were not immune from liability for their acts and omissions. *736 See Wimpee v. Stella, 791 So.2d 915 (Ala. 2000); Ex parte Rizk, 791 So.2d 911 (Ala. 2000). Therefore, Dr. Pacifico would not be entitled to a summary judgment on the claims asserted by Hauseman on the basis that Dr. Pacifico could not be liable for acts and omissions for which the residents themselves, by the application of qualified or discretionary-function immunity, would not be liable.
Further, although the resident physicians were employed by UAB Hospital, Hauseman presented substantial evidence indicating that the residents were under the supervision and control of Dr. Pacifico because they were part of his "team." This Court has held that an employee in the general employment of one master may become a "loaned" or "borrowed" servant of a special or second master and that the special master may be held vicariously liable for the torts of the borrowed servant. See United States Fidelity & Guar. Co. v. Russo, 628 So.2d 486 (Ala.1993); Hendrix v. Frisco Builders, Inc., 282 Ala. 473, 213 So.2d 208 (1968).
"In determining whether an employee has become a loaned servant the ultimate test is: Whose work was the employee doing and under whose control was he doing it[?] Dumas v. Dumas Brothers Manufacturing Co., 295 Ala. 370, 378, 330 So.2d 426, 432 (1976). It is not the actual exercise of control which is determinative but rather the reserved right to control the employee. United States Steel Corp. v. Mathews, 261 Ala. 120, 123, 73 So.2d 239, 242 (1954). Where the work of the employee is part of a large undertaking, mere suggestions as to details necessary for a cooperative effort must be distinguished from actual authoritative direction and control. 261 Ala. at 124, 73 So.2d at 242."
Coleman v. Steel City Crane Rentals, Inc., 475 So.2d 498, 500 (Ala.1985), cert. denied sub nom. Illinois Cent. Gulf R.R. v. Coleman, 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986). "`[W]hether one who is usually and normally the servant of one master has become specially and temporarily the servant of another ... is ordinarily a question of fact.'" United States Steel Corp. v. Mathews, 261 Ala. 120, 123, 73 So.2d 239, 241 (1954) (quoting 2 Mechem on Agency 1447, § 1864). See also Harper v. Gremmel, 703 So.2d 346, 347 (Ala.1997) (Cook, J., dissenting).

III.
That portion of the summary judgment in favor of Dr. Pacifico and UAHSF on Hauseman's claim alleging direct liability on the part of Dr. Pacifico is affirmed. That portion in favor of Dr. Pacifico and UAHSF on Hauseman's claim seeking to hold Dr. Pacifico vicariously liable based on the acts and omissions of the resident physicians who were part of his team is reversed. The case is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and HOUSTON, COOK, LYONS, and JOHNSTONE, JJ., concur.
SEE, J., concurs in part and dissents in part.
MADDOX and ENGLAND, JJ., recuse themselves.
SEE, Justice (concurring in part and dissenting in part).
I concur in that part of the majority's opinion that affirms the summary judgment in favor of Dr. Pacifico and University of Alabama Health Services Foundation ("UAHSF") and against Hauseman on her malpractice claim based on Dr. Pacifico's own acts and omissions. Hauseman offered *737 no evidence indicating that Dr. Pacifico knew of Mrs. Hicks's sternal-wound infection or that he failed to take the necessary steps to remain informed of Mrs. Hicks's condition.
I dissent, however, from the part of the majority's opinion that reverses the summary judgment in favor of Dr. Pacifico and UAHSF on Hauseman's malpractice claim that is based on the acts and omissions of the resident physicians. First, for the reasons set forth in my dissenting opinion in Ex parte Cranman, 792 So.2d 392, 413 (Ala.2000) (See, J., dissenting), I disagree with the majority's reliance on the Cranman test for State-agent immunity. Second, I disagree with the majority's conclusion that there is a genuine issue of material fact as to whether the resident physicians were "loaned" or "borrowed" servants of Dr. Pacifico and UAHSF. In Ex parte Rizk, 791 So.2d 911 (Ala.2000), this Court concluded that the fact that a state hospital allows a resident physician under its employ to bill patients and receive private compensation through a private corporation does not diminish the physician's status as a State employee. Thus, even if the resident physicians were paid by UAHSF,[3] they are still State employees as employees of the University of Alabama at Birmingham Hospital ("UAB Hospital").
In determining whether the resident physicians are entitled to State-agent immunity, I would apply the rule stated in my dissent in Ex parte Cranman:
"Except where the Constitution or laws of the United States or the Constitution, laws, regulations, or rules of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or where the governmental agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law, a governmental agent is immune from civil liability where the conduct made the basis of the claim against the agent is based upon the agent's formulation of plans, policies, or designs, or where the agent otherwise makes decisions such as those made in the context of the following activities:
". . . .
"(4) hiring, firing, transferring, assigning, or supervising personnel;
". . . .
"(6) all other instances where acts or decisions, including those concerning the safety, health, well-being, fitness, competence, development, or confinement of persons, cannot be challenged without imposing a burden arising from interference with a coequal branch of government that exceeds the benefit of the challenging party's right to a judicial remedy."
792 So.2d at 415 (See, J., dissenting and quoting from the withdrawn opinion of November 24, 1999). The resident physicians, in assisting with Mrs. Hicks's coronary by-pass surgery and providing her aftercare, were engaged in discretionary functions. See Ex parte Rizk, supra, 791 So.2d at 914 (See, J., dissenting) (citations omitted). The Alabama Legislature established the University of Alabama as "a seminary of learning" and authorized the governing body of the University, the board of trustees, "to carry into effect the purposes and intent of the Congress of the United States," "to prescribe courses of *738 instruction," and to act in the University's best interest. Ala.Code 1975, §§ 16-47-1 and -34. In furtherance of its educational purposes, the University has created a school of medicine, and, in conjunction with the school of medicine, the University owns and operates UAB Hospital. Ala. Code 1975, §§ 16-47-90 and -95 (authorizing the board or trustees to hold and dispose of any real and personal property for the benefit of the school of medicine). The UAB Hospital provides medical education and training to medical students and resident physicians. The resident physicians in this case were furthering this purpose by caring for Mrs. Hicks. The denial of State-agent immunity to the resident physicians would hinder the educational purposes of the University. See Ex parte Rizk, 791 So.2d at 914 (See, J., dissenting). Therefore, because the resident physicians were exercising a discretionary function and because it does not appear in this case that the burden imposed on Hauseman by applying the rule of State-agent immunity would significantly outweigh the benefits of applying State-agent immunity to the resident physicians, I would apply that immunity to them. Id.
Thus, because I would hold that the resident physicians are immune, I would further hold that Dr. Pacifico and UAHSF cannot be held vicariously liable for the resident physicians' actions. See Roden v. Wright, 646 So.2d 605, 611 (Ala.1994) (holding that where the theory of liability is the doctrine of respondeat superior, if the agent is not liable then the principal cannot be liable). Therefore, I would affirm the summary judgment in favor of Dr. Pacifico and UAHSF.
NOTES
[1] Mrs. Hicks is referred to as Margaret B. Hicks in the complaint. In other parts of the record, she is referred to as Phyllis Hicks.
[2] The record does not indicate Dr. Rosensteel's first name.
[3] The evidence does not indicate whether the resident physicians were paid by UAHSF or by UAB Hospital.