[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10021

_____

AGNES GLENN,
in her capacity as the personal representative of the
Estate of Roderick Darius Rayshon Bolton, deceased,

Plaintiff-Appellant,

*versus*

CORIZON L.L.C.,
M.H.M. CORRECTIONAL SERVICES INC.,
SHELIA BROWN,

Defendants-Appellees,

TERRY RAYBON, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:17-cv-00194-JB-N

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Agnes Glenn appeals from the district court's orders granting summary judgment to three Defendant-Appellees on her medical malpractice and wantonness claims brought under Alabama law.

Glenn filed this lawsuit after her son, Roderick Bolton, died by suicide while in solitary confinement at Holman Correctional Facility in Atmore, Alabama, on September 12, 2015. Originally, Glenn raised federal and state claims against twenty different institutional and individual defendants. As the litigation progressed, Glenn voluntarily dismissed all of her federal claims against all defendants and dismissed her state law claims against all but three defendants: (1) Corizon LLC, a private contractor that provided physical health services to the Alabama Department of Corrections ("ADOC"); (2) MHM Correctional Services, LLC ("MHM"), a private contractor that provided mental health services to ADOC; and (3) Shelia Brown, who worked for ADOC as a psychological associate.

In October 2017, Glenn's fourth amended complaint alleged that MHM, Corizon, and Brown were liable for (1) negligent medical malpractice, under the Alabama Medical Liability Acts ("AMLA") and (2) wantonness under Alabama law. The district court granted summary judgment to MHM in September 2019 and to Corizon and Brown in November 2020.

On appeal, Glenn contends that the district court (1) erred by granting summary judgment to these three defendants on her state law claims; (2) abused its discretion in denying her request to file a fifth amended complaint; and (3) abused its discretion in retaining jurisdiction over her state law claims after she dismissed her federal claims.

After review and with the benefit of oral argument, we must conclude that the district court committed no reversible error.

## I.    FACTUAL BACKGROUND

At the summary judgment stage, we view all facts and draw all inferences in the light most favorable to the nonmoving party—here, Glenn.[1]    *See Eres v Progressive Am. Ins. Co.*, 998

---

[1] In her brief, Glenn relies on a district court's factual findings in *Braggs v. Dunn,* 257 F. Supp. 3d 1171 (M.D. Ala. 2017). But "the findings of fact and reference to testimony in" another district court's order are not admissible evidence and should not be considered on summary judgment. *United States v. Jones*, 29 F.3d 1549, 1553-54 (11th Cir. 1994). For this reason, we do not rely on the factual findings in *Braggs.*

F.3d 1273, 1278 n.3 (11th Cir. 2021).  As we presume the parties are familiar with the facts and procedural history of the case, we will recount only those items necessary to our decision.

## A. Division of Mental Health Care Duties within ADOC

In 2013, MHM entered a three-year contract with ADOC to provide mental health services within Alabama prisons. Specifically, MHM contracted to provide mental health care to a case load of "any inmate coded MH-1 through MH-6," as defined by state regulations (the "MHM case load").  Inmates coded MH-0, defined as "[n]o identified need for mental health assistance" and "[r]eceives crisis intervention services when indicated," were not on the MHM case load.  Bolton was classified as MH-0 and therefore was not on the MHM case load.

In 2015, Shelia Brown worked for ADOC with the job title Psychological Associate II.  Her job duties included speaking to inmates who were not on the MHM case load and deciding whether they should be placed in a crisis cell,[2] removed from a crisis cell, or referred to the mental health professionals at MHM. Brown holds a master's degree in rehabilitation counseling and a bachelor's degree in social work with a minor in psychology.

---

[2] A crisis cell was an individual cell used to house an inmate who prison staff felt was in danger of harming himself or others.  Each cell had a camera in it, and officers checked on the cells regularly.  The bedding, clothing, and equipment in the crisis cells were designed "to remove the mechanisms of suicide."  In September 2015, Holman prison had three crisis cells.

## B.  August 2015

Brown first encountered Roderick Bolton on August 14, 2015, after a corrections officer had him placed in a crisis cell.  At that time, Bolton denied having suicidal thoughts but reported situational depression due to family issues.  Brown decided that Bolton should remain in the crisis cell over the weekend for further observation of his mental status.  On August 17, Brown spoke with Bolton again, and he denied suicidal thoughts and depression.  Brown decided that Bolton should be released from the crisis cell and recommended that he follow up with a psychological associate as needed or requested.

## C.  September 11, 2015

On September 11, 2015, Bolton refused to shave his beard and, as punishment, was assigned to the segregation unit at Holman (otherwise known as solitary confinement).

At 8:20 a.m., before being taken to his segregation cell, Bolton was seen by Corizon nurse Anita Weaver for a "body check."  This involved taking Bolton's vital signs and looking over his face and body for injuries.  As part of the "body check," Nurse Weaver filled out a standard form, entitled "Inmate Body Chart Documentation Form," which had pictures of a human figure where Nurse Weaver was to note any markings or injuries.  The inmate form also had lines under a subheading "Inmate Statement."  On that inmate form, Nurse Weaver wrote that

Bolton said "No statement" when asked for a statement. Both Bolton and Nurse Weaver signed the form.

Usually, when inmates entered segregation, nurses performing their body checks filled out a second form that included questions about their mental health status and history. But Nurse Weaver did not know the reason for Bolton's body check and did not fill out the extra form. Bolton was taken to segregation right after his body check.

About six hours later, Bolton told Sergeant Danny Fountain, who was in charge of the segregation unit, that he was feeling suicidal and wanted to speak to mental health. Fountain took Bolton out of his segregation cell and over to the guards' office. Fountain then called Shelia Brown and told Brown that Bolton had said he was feeling suicidal. Around 2:20 p.m., Brown came to the guards' office to speak to Bolton.

Brown asked Bolton what was going on, and Bolton told her that he was angry with the wardens for insisting that he shave his beard. Unlike when Brown spoke to Bolton on August 14 and 17, she did not ask him if he was having suicidal thoughts or whether he was feeling any situational depression. Brown told Bolton that his concerns were "not mental health related" and that he would not be placed in a crisis cell. Bolton got up and walked out, at which point Sergeant Fountain escorted him back to the segregation unit.

Bolton was found dead at 3:40 a.m. the next day.

## II.    THE ALABAMA MEDICAL LIABILITY ACTS

Glenn contends that the defendants' negligent or wanton medical care caused Bolton's death. With a couple of exceptions that we discuss below, the parties agree that Glenn's claims fall under the AMLA.

Under Alabama law, civil actions against "health care providers" are governed by the AMLA, Ala. Code §§ 6-5-480 *et seq.*, 6-5-540 *et seq.* Specifically, the AMLA provides substantive and procedural rules for tort and contract-based claims of malpractice. Ala. Code. § 6-5-548(a); *see Ex parte Tombigbee Healthcare Auth.*, 260 So. 3d 1, 5 (Ala. 2017) (applying the AMLA to claims of negligence and wantonness against a defendant hospital).

The AMLA defines "health care provider" as "[a] medical practitioner, dental practitioner, medical institution, physician, dentist, hospital, or *other health care provider* as those terms are defined in Section 6-5-481." Ala. Code § 6-5-542(1) (emphasis added). In turn, § 6-5-481 defines "other health care providers" as "[a]ny professional corporation or any person *employed by* physicians, dentists, or hospitals who are directly involved in the delivery of health care services." *Id.* § 6-5-481(8) (emphasis added).

The Supreme Court of Alabama has broadly interpreted the statutory phrase "employed by" to mean used or engaged by, rather than connoting a strict employment relationship. *See*

*Cackowski v. Wal-Mart Stores, Inc.*, 767 So. 2d 319, 324-25 (Ala. 2000). Furthermore, the Alabama Supreme Court has determined that when physicians (who directly deliver health care services) use or engage pharmacists and laboratories, those pharmacists and laboratories fall under the definition of "other health care providers." *Id.*; *Anderson v. Ala. Ref. Labs.*, 778 So. 2d 806, 810 (Ala. 2000).

The AMLA also provides that, in an action against a health care provider for breach of the standard of care, the plaintiff has "the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers." Ala. Code § 6-5-548(a). Generally, the plaintiff is required to present expert testimony to establish the applicable standard of care and a breach of that standard. *Anderson*, 778 So. 2d at 811.

"Liability for a breach of the standard of care depends, first, on the existence of a duty to the patient, which, in turn, depends on the existence of a physician-patient relationship creating the duty." *Wilson v. Teng*, 786 So. 2d 485, 498-99 (Ala. 2000). Whether or not a physician-patient relationship exists "depends upon the facts in each case" and may be proven through any admissible evidence. *See Oliver v. Brock*, 342 So. 2d 1, 4-5 (Ala. 1976) (describing types of evidence the plaintiff could have introduced at summary judgment to prove the existence of a physician-patient relationship).

In addition, the duty of a health care provider to take reasonable steps to prevent a patient's suicide is "conditional on its foreseeability." *Keebler v. Winfield Carraway Hosp.*, 531 So. 2d 841, 845 (Ala. 1988). As relevant here, foreseeability is legally sufficient to establish a duty if the deceased "had a history of suicidal proclivities [or] manifested suicidal proclivities" in the presence of the defendant. *Id.*

## III.    GLENN'S MALPRACTICE CLAIMS

We now turn to Glenn's arguments on appeal regarding the district court's orders granting summary judgment to Corizon, MHM, and Brown on Glenn's state law claims.

### A. Corizon

On appeal, Glenn argues that Bolton's suicide was foreseeable to Nurse Weaver, and thus that Corizon is vicariously liable for Nurse Weaver's medical malpractice in failing to take reasonable steps to prevent his death.[3] According to Glenn's expert witnesses, any reasonable correctional nurse in Nurse Weaver's position (1) would have asked Sergeant Fountain about the reason for his requested body check of Bolton; (2) would have then learned that Bolton was headed to a segregation unit; and (3) would have then asked specific questions about any suicidal feelings and history of being on suicide watch. Those questions

---

[3] In the district court, Glenn alleged that several other Corizon nurses were negligent too. On appeal, Glenn argues only about Weaver's negligence and therefore has abandoned her claims about the other Corizon nurses.

and Bolton's answers might have led Nurse Weaver to recognize Bolton as being at risk to harm himself.

Glenn's argument fails because, among other things, it is wholly speculative that Bolton would have told Nurse Weaver that he was having suicidal feelings at 8:20 a.m. on September 11 even if she had asked those questions. Nurse Weaver did ask if Bolton had a statement and recorded that Bolton had "No statement" to make. Moreover, it is undisputed that Bolton did not ask to "speak to mental health" until nearly six hours later.[4] The district court correctly found that Nurse Weaver had no reason to know, when she examined Bolton at 8:20 a.m. on September 11, that he might harm himself in the near future.

Because Bolton's suicide was not foreseeable to Nurse Weaver, she did not have a duty to take reasonable steps to prevent it. Accordingly, the district court correctly granted summary judgment to Corizon on Glenn's medical malpractice and wantonness claims. *See Keebler*, 531 So. 2d at 845.

## B. MHM

As the district court found, there was no patient-provider relationship between MHM and Bolton, which is needed to

---

[4] Alternatively, Glenn argues that a reasonable jury could find that Nurse Weaver's testimony was not credible, the phrase "No statement" on the inmate form was not a believable statement, and Bolton actually did tell Nurse Weaver about his suicidal feelings at the body check. This is belied by the fact that Bolton signed the form.

trigger liability under the AMLA.  *See Wilson*, 786 So. 2d at 498-99.

It is undisputed that Bolton was not on the MHM case load.  Glenn did not identify any MHM employee who ever treated Bolton or had any responsibility to do so.  There is no evidence that any MHM employees ever interacted with Bolton or were responsible for his treatment on September 11, 2015, or at any other time.  Indeed, it is undisputed that at all times relevant to this appeal, Brown—an ADOC employee—was the ADOC "gatekeeper" who had the ability to decide whether to refer Bolton to MHM.  It is also undisputed that she did not do so.

We also must reject Glenn's argument that the contract between MHM and ADOC created a general duty of care owed by MHM to Bolton as a third-party beneficiary of the contract. The contract required MHM to "operate a comprehensive mental health care services system" and specifically to "manage and deliver a system that will provide constitutionally adequate mental health care *to identified inmates*." (emphasis added).  As noted above, Bolton was never placed, nor identified, within the MHM case load.  We recognize that Glenn argues that the contractual language "comprehensive mental health care services" necessarily included the duty to form and implement a suicide prevention plan.  Glenn, however, ignores that the lengthy contract contains specific obligations, qualifications, and limitations, and this phrase alone, without more, is insufficient to

impose a duty on MHM to create and implement a suicide prevention plan for all inmates in the ADOC system.[5]

Accordingly, the district court did not err in granting summary judgment in favor of MHM on Glenn's state law malpractice and wantonness claims.

## C. Glenn's Medical Malpractice Claim Against Brown

Glenn argues that Brown is liable for negligent medical malpractice under the AMLA because Bolton's suicide was foreseeable to her and she did not take reasonable steps to prevent it. The AMLA, however, does not apply to Brown because she does not fall within the definition of "health care provider" set forth in Ala. Code §§ 6-5-481 and 6-5-542(1).

Brown is employed by ADOC as a Psychological Associate II and holds degrees in rehabilitation counseling and social work. Brown is not a medical or dental practitioner under § 6-5-542(1). Brown also does not meet the statutory definition of "other health care provider" in § 6-5-481, as broadly interpreted by the Alabama Supreme Court.

---

[5] Because we conclude that this contract-based claim lacks merit, we need not and do not decide whether it was timely raised by Glenn. Further, while we conclude that the particular contract between ADOC and MHM did not impose a duty on MHM to create and implement a suicide prevention plan, nothing herein addresses in any way what mental health duties ADOC owed to all inmates at Holman prison or within the Alabama prison system as a whole.

Glenn argues that Brown was used or engaged by MHM because she functioned as a gatekeeper by referring inmates to MHM who were not previously on the MHM case load, and therefore she meets the "other health care provider" definition. The record, however, shows that Brown took direction only from ADOC. There is no evidence that MHM managed or controlled whether or under what circumstances Brown would or should refer an inmate for mental health treatment. Simply put, Brown was not used or engaged by MHM.

The Alabama Supreme Court decisions cited by Glenn support our conclusion. In *Cackowski*, the Alabama Supreme Court determined that physicians (who are directly involved in the delivery of health care services) determine what medication is necessary for treatment of their patients and write prescriptions, which are then filled by pharmacists. *Cackowski*, 767 So. 2d at 325. Thus, the physicians use or engage the pharmacists as "an integral part of the delivery of health care services to the public" and pharmacists are "inextricably linked to a physician's treatment of his patients." *Id.* Similarly, in *Anderson*, the Alabama Supreme Court determined that a reference laboratory met the definition of "other health care provider" in § 6-5-481 because a physician engaged the laboratory's services by sending a patient's fluid sample to the laboratory for specific testing. *Anderson*, 778 So. 2d at 810.

Just the opposite occurred here. Brown, who worked for ADOC, referred inmates to MHM and not vice versa. Brown was

not used or engaged by MHM. Given the record before us and under the particular facts and circumstances presented in this case, we conclude that Brown was not a "health care provider" as defined by the AMLA. Accordingly, the district court properly granted summary judgment to Brown on Glenn's negligent medical malpractice claim brought under the AMLA.[6]

### D. Glenn's Wantonness Claim Against Brown

Because we hold that Brown is not a "health care provider" as defined by the AMLA, Glenn's separately pled claim for wantonness is not governed by the AMLA. *See Tombigbee Healthcare Auth.*, 260 So. 3d at 5.

Under Alabama law, wantonness is "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code. § 6-11-20(b)(3). In a wantonness action, the plaintiff must show that the defendant, "with reckless indifference to the consequences, consciously and intentionally" did some wrongful act or omitted a known duty, and that act or omission produced the plaintiff's injury. *Smith v. Davis*, 599 So. 2d 586, 588 (Ala. 1992).

---

[6] Glenn argues that, even if Brown is not a "health care provider" as defined by the AMLA, her claim survives as an ordinary negligence claim. We decline to wade into this difficult question of state law, because Glenn's fourth amended complaint did not provide adequate notice that she sought to raise a negligence claim against Brown that was not based on medical malpractice under the AMLA. *See* Fed. R. Civ. P. 8(a).

Here, while Brown's conduct on September 11, 2015, may rise to the level of negligence, it was not wanton. *See id.* In Brown's previous interaction with Bolton, he reported situational depression—based on a different issue than the one discussed on September 11—but denied suicidal thoughts. On September 18, Brown told an investigator that she believed Bolton had told Sergeant Fountain that he felt suicidal so that he could speak to her to vent about the wardens. In her deposition, Brown testified that inmates did this frequently because, unless they said they were suicidal, prison officers would ignore that inmates wanted to speak to mental health. Brown testified that she did not believe Bolton to be suicidal on September 11 "[b]ecause he told [her] exactly what his problem was. He went straight to what the issue was. He explained to [her] specifically what was what, why he was angry, and the reason, and who made him angry."

On this record, even assuming it may have been negligent for Brown not to specifically ask Bolton whether he was depressed or thinking of harming himself, we conclude that Glenn has not shown that Brown acted "with reckless indifference to the consequences, consciously and intentionally." *See id.* Thus, the district court properly granted summary judgment to Brown on Glenn's claim of wantonness.

## IV.    GLENN'S PROCEDURAL MOTIONS

Last, we turn to Glenn's contention that the district court abused its discretion in two procedural rulings.

In August 2018, Glenn moved for leave to file a fifth amended complaint, in order to (1) withdraw her two federal claims and (2) add allegations to the state law medical malpractice and wantonness claims. Glenn also moved the district court to exercise its discretion to dismiss her state law claims without prejudice so that she could re-file the case in state court.

At a hearing, the district court granted Glenn's motion to dismiss the federal claims but decided to retain supplemental jurisdiction over the state law claims. It explained that it was "very sure other judges" would not exercise supplemental jurisdiction, but it would. It stated that "it would be a different thing if we were at the early end of the case."

In a subsequent written order, the district court denied Glenn's untimely motion to amend the complaint. It found that Glenn had not shown good cause to modify the scheduling order, as required by Fed. R. Civ. P. 16(b)(4). It rejected Glenn's argument that Ala. Code § 6-5-551, which requires AMLA plaintiffs to amend their complaints with pertinent information, provided good cause, as that statute "neither modifies Rule 16(b) deadlines nor the consequences of a party's failure to observe them." It further found that Glenn had not shown diligence in filing the motion to amend, as—even in the best light—she waited more than two months after discovering the new information alleged.

Glenn has not identified an abuse of the district court's considerable discretion in either of these procedural rulings.

## V.    CONCLUSION

The district court committed no reversible error in its denial of Glenn's procedural motions or in its orders granting summary judgment in favor of Corizon, MHM, and Brown. Accordingly, we affirm.

**AFFIRMED.**